AMERICAN EMPIRE INSURANCE
COMPANY OF SOUTH DAKOTA
et al., Appellants,

v.

FIDELITY AND DEPOSIT COMPANY
OF MARYLAND, Appellee.

No. 24385.

United States Court of Appeals
Fifth Circuit.

March 6, 1969.

Rehearing Denied April 3, 1969.

**73**

Jacksonville, Fla., Marks, Gray, Yates, Conroy & Gibbs, Jacksonville, Fla., of counsel, for appellee.

Before JONES, WISDOM and DYER, Circuit Judges.

DYER, Circuit Judge:

Fidelity and Deposit (F & D) sought a declaratory judgment to have its liability determined on a fidelity bond issued by it to certain named insureds as defendants. To avoid a multiplicity of suits in various courts, it was stipulated that certain parties claiming to have interests protected by the bond be permitted to intervene.[1] The District Court rendered summary judgment against the intervenors on their claims and their counterclaims, holding that they were neither named insureds in, nor third party beneficiaries of the bond. This appeal followed. We affirm.

The facts are undisputed. The fidelity bond issued by F & D provided for the indemnification of the four corporate named insureds for any losses caused by "fraudulent or dishonest" acts of their employees. The defendant corporations operated as brokers or clearinghouses for insurance companies but sold no insurance of their own. Hail Pool managed a pool created by certain insurance companies to cover hail damage to crops owned by farmers who were insureds of these companies. Hail Pool collected the premiums for these companies and paid any losses suffered by the companies' insureds. At the end of the year any excess was remitted to the participants of the pool. Foreign Management and Pan American acted as intermediaries between insurance companies and reinsurance companies. They transmitted reinsurance premiums from the rein-

W. Warren Cole, Jr., Black, Cobb, Cole, Crotty & Sigerson, Daytona Beach, Fla., for appellants.

Harry T. Gray, Francis P. Conroy, George Stelljes, Jr., Delbridge L. Gibbs,

1. The defendants named in the complaint (and who were named as insureds in the fidelity bond issued by F & D) were: USAFORM Pan-American, Ltd. (Pan-American); USAFORM Hail Pool, Inc. (Hail Pool); U.S. & Foreign Management, Inc. and U.S. & Foreign Management, Ltd. (Foreign Management); and Barbara B. Murphy, as Receiver for the latter three corporations. The inter-

venors (who were not named in the bond) were: American Empire Insurance Company of South Dakota, on behalf of itself and all other insurance companies who were shareholders in the USAFORM Hail Pool; Stuyvesant Insurance Company, on behalf of itself and all other insurance companies who employed U.S. & Foreign Management, Ltd., and USA-FORM Pan-American, Ltd.

sured company to the reinsurer and remitted return premiums from the reinsurer to the reinsured. The named insureds had the following in common: F. Wylly Clarke was the Chief executive officer and controlled each corporation; each corporation was a named insured in the fidelity bond issued by F & D; each corporation was in possession of premium monies belonging to insurance companies; and each corporation was found to have substantial shortages in its premium accounts.[2]

The claims made on the bond by the named insureds attributed the shortages to the dishonesty of Clarke acting alone and/or in collusion with others. F & D disclaimed liability under the bond. The plaintiff and the defendants stipulated that American Empire Insurance Company could intervene as the class representative for the Pool Participants who were claiming loss of their premium monies held by Hail Pool and that Stuyvesant Insurance Company could intervene as the class representative for the underwriters who were claiming loss of reinsurance premiums and return premiums entrusted to Foreign Management and Pan American. In addition to seeking recovery on the bond the intervenors counterclaimed for punitive damages, alleging that F & D fraudulently refused to acknowledge its liability under the bond to the named insureds. The District Court granted a partial summary judgment finding that "* * * there is no genuine issue as to any material fact that would sustain the right of any one of the intervenors * * * to recover under the bond * * either as a named insured or as a third party beneficiary protected by the bond * * *." The District Court likewise denied the intervenor's counterclaim for punitive damages.

The sole issue to be resolved in this appeal is whether or not the intervenors are third party beneficiaries of the bond, as they insist. To support this, intervenors urge that it was the underwriting intent of F & D that the intervenors were to be beneficiaries of the bond. This must be concluded, the intervenors say, because of (1) the probable lack of liability of F & D to the named insureds; (2) correspondence exchanged between F & D and the named insureds' president Clarke, and (3) the terms of the bond itself.

Intervenors' attempt to prognosticate the outcome of a trial on the merits of F & D's liability to the named insureds in the bond gives us little pause. F & D's liability vel non has not been decided by the District Court and is not now before this Court. Whether the underwriter may or may not have a defense against its named insureds is not relevant in considering F & D's liability to the Pool Participants as third party beneficiaries of the bond.

The exchange of correspondence between Clarke and F & D, the intervenors argue, furnishes evidence of the underwriting intent to protect the intervenors. On January 16, 1962, Clarke wrote F & D as follows:

> In setting up USAFORM Hail Pool, Inc. we will maintain two bank accounts; one a premium account, and the other a general account. Management fees and overwriting commissions will be deducted from premiums and put in the general account which belongs solely to Hail Pool. The premium account belongs to the Pool Companies; however, from this account will be paid losses and loss adjustment expenses incurred, and recognized Pool expenses.

2. On February 18, 1963, Hail Pool was placed in receivership by order of the Seventh Judicial Circuit Court, Flagler County, Florida. An audit of the books of Hail Pool disclosed a shortage of premium monies belonging to pool participants in the amount of $311,624.58. The same court placed Foreign Management in receivership on the same date. An audit of the books of Foreign Management disclosed a shortage of $277,308.43 in premium monies belonging to insurance companies doing business with it. An audit of the books of Pan American disclosed a shortage of premium money deposits in the amount of $42,239.21.

Several of the Pool Companies have approached us and asked if our fidelity bond could be extended to protect them in case of loss in the premium account due to dishonesty of Hail Pool's employees. I am wondering if this is not now covered under the bond as follows:

"Ownership of Money or Other Property

"Section 5. The Insured property may be owned by the Insured or held by the Insured in any capacity whether or not the Insured is liable for the loss thereof, or may be property as respects which the Insured is legally liable."

I really don't know how to interpret the above unless the Pool participants were named as assureds under the bond. Would this be possible? If they are not named, does our bond protect the companies against loss on the funds in the premium account?

In reply, the Vice President of F & D wrote Clarke:

I have discussed with Mr. Henderson and our executives at our Home Office, your question as to the extent of cover of the "Ownership of Money or Other Property Clause" as appearing in the bond. It is our opinion that the funds in the "Premium Account" are covered against loss through any of the acts covered by our bond caused by employees of our USAFORM as defined therein.

The premiums in the "Premium Account", although they may belong to the Pool members, constitute money "belonging to USAFORM", or in which Hail Pool has a pecuniary interest, or for which the corporate entity is legally liable, or held by the Corp., in any capacity whether legally liable therefor or not.

We cannot extend the bond to the Pool's participants since they do not qualify as "joint insureds". Our liability is confined to USAFORM Hail Pool, Inc., and we cover only the losses which it may sustain through acts covered by the bond. If funds in the

"Premium Account" are embezzled by the employees of Hail Pool, therefore, we would reimburse the Corp. for such funds either as property held by USAFORM in any capacity as respects which it is legally liable to others, viz, the Pool's participants. In other words such property is covered by the bond but not directly in favor of the Pool's participants.

The Pool's participants are not eligible to be Joint Insureds under the bond under our rules because to include them as such would make the bond liable for the acts of their employees, in addition to the acts of USAFORMS employees.

We believe the above interpretation should satisfy the Pool's participants as to a possible loss in the "premium account" due to dishonesty of Hail Pool's employees.

Thereafter Clarke wrote one of the Pool Participants:

While we cannot arrange with Fidelity and Deposit to extend coverage to the pool companies as "joint insureds", it is true that we are covered against losses which may be sustained through acts covered by the Commercial Blanket Bond. This, in turn, means that the pool companies would be protected.

If the correspondence may be considered as evidence of underwriting intent, about which we have grave doubts because the bond's language is clear and unambiguous, we read the letters to say no more than that the Pool Participants could be indirectly benefited by the bond since an *insured* loss of the Premium Account funds would be covered and Hail Pool would then be paid under the terms of the bond. To include the Pool Participants within the coverage of the bond would result in the inclusion of their employees. It is obvious that such was not the intent of the parties.

Going one step further the intervenors argue that the correspondence is not just evidence of underwriting intent, it is a constituent part of the bond. This is both novel and unsound. There was no

correspondence by F & D with the Pool Participants. The Pool Participants were never named as additional insureds. F & D refused to name any of them in its fidelity bond. None of the Pool Participants paid any premium to F & D for protection under the bond or applied to F & D directly for fidelity insurance on the Pool operations. Buxton v. International Indemnity Company, 1920, 47 Cal.App. 583, 191 P. 84, and Aetna Insurance Company v. Eisenberg, 8 Cir. 1961, 294 F.2d 301, relied on by intervenors are inapposite. In *Buxton* the court held that a letter agreement preceding the issuance of a policy, that the policy would cover certain risks, became a part of the insurance contract subsequently issued. Here F & D never recognized the right of any Pool Participant, nor did F & D ever send a letter to a Pool Participant giving any interpretation of the bond, or indicating that its coverage extended to anyone other than the named insureds. In *Eisenberg*, the contract specifically gave the customers of the insured the right to sue.

■ Pointing to Section 5 of the conditions and limitations of the bond, "The insured's property may be owned by the insured, or held by the insured in any capacity whether or not the insured is liable for the loss thereof, or may be property as respects which the insured is legally liable," the intervenors urge that this protects third parties whether the named insureds are legally liable or not and where the contracting parties intend to confer a benefit on a third party, the third party has a direct action to enforce it. It is true that any losses suffered by the named insureds, whether or not the insureds were liable for the loss thereof, are covered. This would cover losses of funds held by a named insured which it may or may not owe to the Pool Participants. Legal liability of the named insured to a third party does not, however, create a legal liability of F & D to third parties under the bond. The claims of the third party Pool Participants are not against F & D but against the named insureds or their

Receiver for failure to account to the Pool Participants. Since contracting parties are presumed to act for themselves, such an intent to benefit should be clearly expressed in the contract. In American Surety Co. of New York v. Smith, 1930, 100 Fla. 1012, 130 So. 440, Judge Strum, then a Justice of the Supreme Court of Florida and later a Judge of this Court, stated:

> Where, therefore, it is manifest from the nature or terms of a contract that the formal parties thereto intended its provisions to be for the benefit of a third party, as well as for the benefit of the formal parties themselves, the benefit to such third party being the direct and primary object of the contract, or amongst such objects, such third party may maintain an action on the contract even though he be a stranger to the consideration.

*Id.*, 130 So. at 441.

■ It would seem that it is not manifest from the nature of a fidelity bond that uninsured parties should be allowed to recover. Rather, in the case *sub judice*, Judge Strum's further comment is more apropos:

> When a contract is designed solely for the benefit of the formal parties thereto, third persons cannot maintain an action thereon, even though such third persons might derive some incidental or consequential benefit from its enforcement. Leon v. Kerrison, 47 Fla. 178, 36 So. 173; Wright v. Terry, 23 Fla. 160, 2 So. 6.

*Id.*, 130 So. at 441. See also 7 Fla.Juris. 169, Contracts Section 101; First National Bank of St. Augustine et al. v. Perkins, 1921, 81 Fla. 341, 87 So. 912; Punta Gorda Bank v. State Bank of Ft. Meade, 1907, 52 Fla. 399, 42 So. 846.

■ In an effort to put a more equitable gloss on the Pool Participants as third party beneficiaries the intervenors take the position that if the bond was not written for their benefit there is no reason for the bond because Clarke was the alter-ego of the defendant corporations and his dishonesty forecloses any

liability of F & D. Clarke, however, was only one of the employees covered by the bond. Moreover, F & D denied liability because other officers of Hail Pool knew of Clarke's dishonesty. The mere fact that Clarke may be the alter-ego of the defendant corporations does not eliminate F & D's liability. There is no doubt that Clarke was covered by the bond.

■■■■ Intervenors rely upon property insurance, warehousemen's liability and bailor-bailee cases in an attempt to analogize them with their asserted third party beneficiary claims here. But a distinction must be drawn between indemnity and property insurance. The fidelity bond was an indemnity insurance contract. The insurer's liability does not arise until the insured has suffered a proven loss. It is in the nature of a personal insurance contract. The insurance is not on property but is for loss of property. This distinguishes Globe and Rutgers Fire Ins. Co. et al. v. United States, 5 Cir. 1953, 202 F.2d 696, urged upon us by the intervenors, which involved a policy insuring property against loss by fire. Hail Pool's policy insured only losses resulting from a breach of duty by an employee.

The distinction between insurance on property and on loss of property also applies to the warehousemen cases and the bailee cases. Moreover, in Aetna Insurance Co. v. Eisenberg, *supra*, relied on by intervenors, where the insurer had issued a furrier's customer basic policy, the contract gave the customers the right to sue. United States Fidelity and Guaranty Co. v. Slifkin, N.D.Ala. 1961, 200 F.Supp. 563 involved coverage of consigned jewelry which was stolen from the bailee. The contract had an "in-trust-and-on-commission" clause which is common in bailee insurance contracts and under which bailors generally are allowed to sue under a third party beneficiary statute. But here again, this clause is interpreted to insure a bailor's insurable interest in property, and this is so irrespective of the bailee's legal liability for loss.

Finally, intervenors' reliance on New Amsterdam Casualty v. W. D. Felder & Co., Inc., 5 Cir. 1954, 214 F.2d 825, is misplaced. The court there simply held that a named insured was not prevented from suing even though he was not the first named insured in the policy.

■■■■ We are of the firm view that F & D's contract meant just exactly what it clearly said, that is, that it insured the named corporations and those corporations only, against the defalcations of their employees. We can find no support for the intervenors' contention that the District Court should re-write the contract. The rule was succinctly stated in Hawkeye-Security Ins. Co. v. Myers, 7 Cir. 1954, 210 F.2d 890, 893, and was adopted by us in Greyhound Corp. v. Excess Insurance Company of America, 5 Cir. 1956, 233 F.2d 630:

> * * * the insurance policy is the contract between the parties and that the provisions of that contract, which are clear and unambiguous and which are neither illegal by statute nor by reason of their being against public policy, should be enforced by the courts. The courts may not re-write for the parties insurance contracts which are clear and unambiguous.

Summary final judgment against the intervenors was properly entered by the District Court. We therefore do not reach the question of punitive damages sought by the intervenors against F & D.

Affirmed.

WISDOM, Circuit Judge (dissenting).

I respectfully dissent.

F & D denied liability on the bond on the stated ground that "F. Wylly Clarke, Jr. was never covered". In the complaint F & D alleged that Clarke was "the sole stockholder and alter-ego of each of the assured"; that his fraud was therefore attributable to the assureds. This position, basic to the complaint, rendered the bond worthless to the persons for whom it was primarily issued—the owners of the premium money in the pool.

The law of contracts is not so encrusted with form that we cannot, in this case, cut through the shell of a two-party contract and give effect to the three-party arrangement all of the parties understood and on which the third party beneficiaries, to their detriment, relied. We do not have to prostrate ourselves before Clear and Unambiguous Words when in their natural setting the words mean something more than they say.

The Court's error lies in its assumption that the intervenors' case depends on showing "that it was *the underwriting intent of F & D* that the intervenors were to be beneficiaries of the bond". This is not a case involving only the formal contracting parties where the Court's task is to determine the parties' expressed intention. When third parties rely on a bond, and the bond is primarily for the protection of the third parties, a court is not justified in looking only to the underwriting intent of the insurer. As Williston points out in discussing contracts for the benefit of a third person, "There is no requirement of a mutual intent, as to right of enforcement, on the part of the contracting parties; instead, it is the intent or purpose of the promisee who pays for the promise that has generally been looked upon as governing". 2 Williston on Contracts § 356. See also 4 Corbin on Contracts §§ 774, 770C and Restatement of Contracts § 133(b), 136(1) (a).

Here the promisee was Clarke (through his corporations). Although a purpose of the bond may have been to protect his companies from the defalcations of other employees, there is no doubt that the primary purpose was to protect the Pool Participants to whom the premium money belonged. As Messinger, head of F & D's Underwriting Department testified, a severe loss could result only from Clarke's defalcation. Business obligations to the Pool Participants compelled him to take out the bond to insure his own fidelity. He, of course, knew that the intervenors were relying on the bond for protection of the pool. The correspondence shows that F & D was fully aware of all the facts and of the intervenors' reliance on the bond. No one contends that the Pool Participants were Join Insureds (for their employees would then be covered). The contention is that the object of the bond was to protect the Pool Participants; performance of the bond would satisfy the promisee's obligation to pay the Pool Participants; the insurer received premiums to perform its promise. The Pool was in the nature of a trust fund beneficial title to which was in the participants.

I would analogize the relationship between Clarke and the Pool Participants to the relationship between a bailor and bailees. Clarke was in the business of holding premium money for others and managing it as a pool. If Clarke's companies had been in the business of storing furs, and if the furs had been destroyed by fire, the bailors could have maintained a direct action against the bailee's insurer. Aetna Insurance Co. v. Eisenberg, 8 Cir. 1961, 294 F.2d 301. If Clarke had been holding rolls of paper rejected after delivery and cancellation of the purchase order, the owner of paper would have taken the place of the insured and recovered on a fire loss. Exton & Co. v. Home Fire and Marine Insurance Co., 1928, 249 N.Y. 258, 164 N.E. 43, 61 A.L.R. 718. If the insureds here had been storing for others distilled spirits, the owners could have sued the insurer for the value of the spirits destroyed by fire. Lewis v. Home Insurance Co., 199 App.Div. 556, 192 N.Y. S. 170.

In United States Fidelity & Guaranty Company v. Slifkin, N.D.Ala.1961, 200 F.Supp. 563, the pertinent policy clause was similar to Section 5 of the F & D bond: "The money, securities and other insured property (except the Premises) may be owned by the Insured or held by him in any capacity whether or not the Insured is liable for the loss thereof."

The court, in construing this clause, stated:

> Generally, such a clause is held to insure the bailor's insurable interest under a third party beneficiary theory, it being necessary only that there be an expression in the bailee's policy of an intent to insure the bailor's interest. * * * The express language of this clause gives to the bailor a right to be indemnified under the bailee's policy irrespective of the bailee's legal liability for the loss. * * * Elsewhere, moreover, it has been held that the bailor may maintain independently an action against the bailee's insurer in such a case, even where the bailee had deliberately omitted the bailor's claim from proofs of loss. B. N. Exton & Co. v. Home Fire & Marine Ins. Co., 249 N.Y. 258, 164 N.E. 43 (1928). See Stillwell [Stilwell] Frozen Foods, Inc. v. North British & Mercantile Ins. Co., 184 F.Supp. 629 (W.D.Ark.1960); Globe & Rutgers Fire Ins. Co. v. United States, supra. In Alabama, the general principle has been applied in other contexts: A third party beneficiary's right to bring an action directly against the obligor for enforcement of his rights under a contract to which he was not a party has been upheld repeatedly.

In Globe & Rutgers Fire Insurance Co. v. United States, 5 Cir. 1953, 202 F.2d 696, the United States brought suit against six insurance companies for loss by fire of cotton seed belonging to the Commodity Credit Corporation in the custody of a cotton gin company, the named insured. Each of the insurance policies provided: " * * * this policy shall also cover property sold but not delivered, held in trust or on consignment or for storage." This Court held that the United States was protected by the policy provision and could bring a direct action against the insurers.

The Court seeks to distinguish the Globe & Rutgers case on the basis of the conceptual difference between insurance against fire losses and insurances against losses due to employee dishonesty. The insurer in the latter instance, it says, acts as an indemnitor and becomes liable only after the insurance has suffered a "proven loss". At this stage of the litigation, of course, losses due to Clarke's dishonesty must be taken as "proven". Beyond that, whether the insurance is called "property" or "indemnity" should not matter. The only distinction between the Globe & Rutgers situation and ours is that the cause of the loss there was natural rather than human. I am unable to understand how the Court finds that difference meaningful.

In all of these cases and many others that might be cited the third party is treated as if he were the beneficiary of a fiduciary relationship or the real party at interest. This is because the basic contract is for the benefit of the third party. Here, as to Clarke's misappropriations, the bond would have been meaningless—unless the parties had intended to protect the Pool Participants against Clarke's own defalcation.