**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Maryland corporation, Plaintiff,**

v.

**USAFORM HAIL POOL, INC., etc., et al., Defendants.**

Civ. No. 63–186.

United States District Court,
M. D. Florida,
Jacksonville Division.

Sept. 25, 1970.

**1302**

George Stelljes, Jr., Marks, Gray, Conroy & Gibbs, Jacksonville Fla., for plaintiff.

W. Warren Cole, Jr., Black, Cobb, Cole, Crotty & Sigerson, Daytona Beach, Fla., for defendants.

## OPINION

SCOTT, District Judge.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND, hereinafter called F. & D., sought a Declaratory Judgment to have its liability determined on a fidelity bond issued by it to certain named corporate insureds. Third parties not named in the bond but who claimed to have interests protected by the bond, intervened in the suit. This Court entered a summary judgment against the intervenors. Upon appeal, that ruling was affirmed. American Empire Insurance Co. v. Fidelity & Deposit Co. of Md., 408 F.2d 72 (CA 5th 1969).

The bond was given to insure the named corporate insureds against loss through fraudulent or dishonest acts committed by the insureds' employees. As counterclaims had been filed on behalf of three of the insured corporations seeking to recover sums totaling $631,-172.22, procedurally the action continued, following the appeal, as though the claimants were plaintiffs and F. & D. the defendant.

Claimants based their right of recovery on a variety of alleged fraudulent and dishonest acts on the part of F. Wylly Clarke, Jr., an employee of the insured corporations. As a result of extensive pre-trial stipulations the issues of this very complex case have been narrowed and simplified. There is no substantial dispute concerning the facts, and these efforts of counsel for both sides have been of immeasurable assistance to the Court.

The bond issued by F. & D., for which a premium was charged, included as

named insureds USAFORM Pan-American Ltd. (Pan-American), USAFORM Hail Pool, Inc. (USAFORM), U. S. & Foreign Management, Ltd. (Limited), and U. S. & Foreign Management, Inc., who, with Barbara B. Murphy as Receiver for the last three named corporations, were the defendants named in the Complaint.

U. S. & Foreign Management, Inc. was USAFORM's predecessor corporation in the operation of Clarke's crop hail insurance business. At it was not active when the claimed losses occurred, no claim was submitted on its behalf.

USAFORM was organized in November of 1961. During its first and only crop year, 1962, it acted as manager of a pool created by certain insurance companies (pool participants) to cover hail storm damage to crops owned by farmers who were insureds of these pool participants. USAFORM collected the insurance premiums for the pool participants and deposited the premiums in a segregated trust account which belonged to the participants. Under the pooling arrangement, USAFORM was to pay, on behalf of the pool participants, losses to farmers and expenses of the pool, deduct its commissions, and, at the end of the pool's operating year, remit the balance in the premium account to the participants. Thus, each pool year was a self-contained operation, commenced and completed in one year and involving only one growing season. The function of USAFORM was that of a manager and it sold no insurance of its own.

Limited and Pan-American likewise sold no insurance but acted as intermediaries between insurance companies desiring to reinsure or "cede" portions of their liability under insurance policies and insurance companies desiring to reinsure portions of the liability under such insurance policies. The reinsurance premiums payable to the reinsuring companies were delivered to Limited and Pan-American for transmittal to the reinsuring companies. By reason of the numerous transactions, there was a constant balance of such reinsurance premium monies on deposit with Limited and Pan-American. These premium monies belonged to the insurance companies (underwriters group) doing business with Limited and Pan-American. Under Sections 125 and 5, Insurance Law, Volume 27, McKinney's Consolidated Law of New York, c. 28, which were stipulated into the record and which governed the operation of these two companies, premium monies received by Limited and Pan-American were held in a fiduciary capacity, and were required to be deposited in an account separate from the corporation's own funds. Violation of this anti-commingling section is a crime.

The evidence is undisputed that these insured corporations had the following in common: Clarke was the sole stockholder, alter ego and chief executive officer of each, and clearly dominated each of them; each was a named insured in the bond; each was in possession of substantial amounts of premium monies belonging to insurance companies; and each was found to have substantial shortages in its premium accounts.

On February 18, 1963, USAFORM was placed in receivership by order of the Circuit Court, Flagler County, Florida. An audit of the books of USAFORM disclosed a shortage of premium monies belonging to pool participants in the amount of $311,624.58. The Circuit Court placed Limited in receivership on the same date. An audit of the books of Limited disclosed a shortage of $277,-308.43 in premium monies belonging to insurance companies doing business with it. An audit of the books of Pan-American disclosed a shortage of premium money deposits belonging to insurance companies in the amount of $42,239.21. The audit reports were admitted into evidence by stipulation of the parties and the evidence submitted at the trial substantiated the amounts of the shortages therein disclosed.

F. & D.'s bond was a printed Blanket Protection Bond, undertaking to indemnify the named insureds against any loss of money sustained as a result of

any fraudulent or dishonest acts committed by any employee of the insureds acting alone or in collusion with others. The coverage provided was $100,000.00 as to each employee involved in such covered losses, plus $400,000.00 of excess coverage. The salient portions of the sections of the bond involved in this suit are these:

"Section 5. The insured property may be owned by the Insured, or held by the Insured in any capacity whether or not the Insured is liable for the loss thereof, or may be property as respects which the Insured is legally liable."

"Section 6. The coverage of this Bond shall not apply to any Employee from and after the time that the Insured or any partner or officer thereof not in collusion with such Employee shall have knowledge or information that such Employee has committed any fraudulent or dishonest act in the service of the Insured or otherwise. * * * *"

"Section 7. Upon knowledge or discovery of loss under this Bond, the Insured shall (a) give notice thereof as soon as practicable to the Underwriter or any of its authorized agents, and (b) file detailed proof of loss, duly sworn to, with the Underwriter within four months after the discovery of loss. * * * *"

"Section 12. This Bond shall be deemed canceled as to any Employee: (a) immediately upon discovery by the Insured, or by any partner or officer thereof not in collusion with such Employee, of any fraudulent or dishonest act on the part of such Employee; * * * *"

The significance of these provisions will hereinafter become apparent.

Barbara Murphy, as Receiver, notified F. & D. by letter dated February 22, 1963, that claims under the bond would be made on behalf of the named insureds. The letter was referred to Ralph O. Barnett, F. & D.'s Assistant Claims Manager, an experienced claims attorney, having been in F. & D.'s claim department for 43 years. He dispatched W. P. Rossiter, an attorney in the employ of F. & D., to Daytona Beach for an on-the-spot investigation. Rossiter made at least two detailed reports of his findings to Barnett. Parts of these reports are in the record (R. 224–254) and outlined the claims that the Receiver would make.[1] In mid-March, 1963, he reported to Mr. Barnett that there was no doubt that Clarke had "gutted" the insured corporations.

Mr. Barnett personally came to Daytona Beach on August 9, 1963, and was shown all the records then in possession of the Receiver, and, on August 30, 1963, F. & D. commenced this action. It has been stipulated that no issue is raised as to the timely filing of proofs of loss on behalf of all three corporations.

Against this factual background, the parties entered into a series of pre-trial stipulations which the Court confirmed and which provided for admission into evidence a mass of documentary and other evidence, including the pertinent portions of the printed record on the aforesaid appeal.

The issues presented for determination in this suit, factual, legal, and mixed, are these:

1. Whether fraudulent or dishonest acts were committed by employees of the insured corporations, within the meaning of those terms as used in the bond, and if so, by whom.

2. Whether the losses resulting from Clarke's actions were such losses as are contemplated by the bond.

3. Whether the fact that Clarke was the alter ego of the insured cor-

---

1. References in this Opinion to "(R. ___)" are to the printed record on the first appeal of this case to the United States Court of Appeals for the Fifth Circuit. Parts of this printed record were included in the trial record of this cause as Claimants' Compound Exhibit 1 and reference is made to the printed record for convenience.

porations eliminated F. & D.'s liability for loss occasioned by Clarke's dishonesty.

4. If the insured corporations had "officers" other than Clarke within the meaning of the bond, (i) whether these "officers" had knowledge of Clarke's dishonesty, and if so (ii) whether these other "officers" acted in collusion with Clarke. (i. e., whether coverage as to Clarke's misdeeds was lost through application of the knowledge and discovery provisions contained in sections 6, 7 and 12 of the bond)

5. The amount of coverage furnished by the bond.

6. The amount of interest to be allowed to claimants.

The parties entered into a pre-trial stipulation that as a matter of fact and law Clarke was the sole stockholder and alter ego of the named insureds. It was also stipulated that as a matter of fact and law, Clarke was a covered employee under the bond and that the bond was in full force and effect at all times material to this suit.

## 1. *Fraudulent and Dishonest Acts*

F. & D.'s first contention is that the claimants have not related specific loss transactions to specific acts of dishonesty. This contention is without merit.

In the case of USAFORM, the evidence showed that prior to April 7, 1962, only 10% or 15% of the premiums for the 1962 season had been received. From that date, which was the effective date of the bond rider adding USAFORM as a named insured, until the corporation went into receivership on February 23, 1963, USAFORM received over $3,900,000.00 of premium monies which it obligated itself to maintain in a segregated trust account entitled "Hail Account". It could, by contract with the pool participants, pay from these premium monies only authorized pool expenses, and its commissions, which

totaled approximately $130,000.00 for the year. In writing to F. & D. (R. 59) and the pool participants (R. 66), Clarke made it clear that the premium account was a trust fund belonging to the pool participants. In testifying, William Grundy and Barbara Murphy likewise made it clear that these funds were trust monies. The unrefuted evidence shows that the following unauthorized disbursements were made from the Hail Account belonging to the pool participants:

| | |
|---|---|
| Repayment to First Atlantic National Bank of a portion of a loan made to the corporation, presumably for corporate operating expenses, in excess of | $ 70,000.00 |
| Payments on account of debts for a 1961 hail pool, which debt had been assumed by USAFORM from another Clarke corporation, in excess of | 170,000.00 |
| Transfers to USAFORM's regular corporation account in excess of commissions to which it was entitled, in excess of | 178,000.00 |
| TOTAL UNAUTHORIZED EXPENDITURES | $418,000.00 |

The uncontradicted evidence is that the transfers from the premium account, outlined above, occurred after April 7, 1962. The audit of the "Hail Account" made by Singleton L. Greene, C.P.A., following the collapse of the Clarke corporations, disclosed a shortage in the Hail Account of $339,909.40. The Receiver applied certain credits against this to reduce her claim to $311,624.58. F. & D. introduced into evidence a report made by one of its employees, George J. Riggs, who apparently, in cooperation with another accountant, made an investigation after the collapse. Riggs questioned the inability of USAFORM to restore these funds to the Hail Account, noting that USAFORM appeared to have over $600,000.00 in other assets. The only support for Riggs' contention is a pro forma balance sheet introduced at the trial which listed as an asset "good will" of $780,000.00, giving USAFORM a surplus of $600,000.00. If the illusory asset, good will, was removed from the balance sheet, USAFORM was in a deficit position. The undisputed testimony from Donald P. Zima, a certified public accountant called by Claimants, was that

USAFORM was totally insolvent at the time of its organization at which time its assumed liabilities exceeded its assets by more than $175,000.00, and that at no time thereafter did it achieve a state of solvency. The Court finds that the foregoing transfers from the Hail Account of approximately $418,000.00 made by Clarke or his employees at his direction, during a time when USAFORM was insolvent, were dishonest and fraudulent invasions by Clarke of a trust fund clearly belonging to the pool participants and amounting to a loss protected against by Section 5 of the bond. These wrongful acts were willful and flagrant violations of the fiduciary duty that was owed the pool participants. Glens Falls Indemnity Co. v. National Floor and Supply Co. (C CA 5th) 239 F.2d 412, 414; Franklin Savings and Loan Company of Macon v. American Employers Insurance Company (CCA 5th) 99 F.2d 494; Insurance Company of North America v. Greenberg (CCA 10th) 405 F.2d 330; Genesee Wesleyan Seminary v. United States Fidelity & Guaranty Co., 247 N.Y. 52, 159 N.E. 720; Duel v. National Surety Corp., 64 F.Supp. 961, affirmed 157 F.2d 516. In the latter case, Judge Duffy used language which accurately applies here when he said at page 966:

"The plaintiff correctly maintains that failure to remit premiums under the agency contract being established, such failure, aside from all other considerations, constituted acts on the part of Kambe for which the defendant is liable under the bond. Such failure is dishonest action. Citizens' Trust & Guaranty Co. v. Globe & Rutgers Fire Insurance Co., 4 Cir., 229 F. 326, Ann. Cas.1917C, 416; National Surety Co. v. McCutcheon, Tex.Civ.App., 270 S.W. 1062; Fidelity & Deposit Co. of Maryland v. People's Bank of Sanford, 4 Cir., 72 F.2d 932; American Surety Co. v. Pauly, 170 U.S. 160, 162, 18 S.Ct. 563, 42 L.Ed. 987. Such failure is also fraudulent action. Magee v. Manhattan Life Insurance Co., 92 U.S. 93, 23 L.Ed. 699. In addition, such failure is embezzlement. United American Fire Insurance Co. v. American Bonding Co., 146 Wis. 573, 131 N.W. 994, 40 L.R.A.,N.S., 661; Aetna Life Insurance Co. v. Mabbett, 18 Wis. 667; Wells v. Collins, 74 Wis. 341, 43 N.W. 160, 5 L.R.A. 531; Black v. Whitewater Commercial & Savings Bank, 188 Wis. 24, 205 N.W. 404; Illinois Surety Co. v. Donaldson, etc., 202 Ala. 183, 79 So. 667."

The Receiver's claim of $311,624.58 has been clearly established.

■ In the case of Limited, the uncontradicted testimony shows that some six months after the effective date of the bond, its current assets exceeded its current liabilities by $77,000.00. Through the Riggs report, F. & D. attempted to show that Limited was insolvent at the time F. & D.'s bond became effective, the report stating that cash on hand immediately prior to the effective date of the bond was insufficient to pay outstanding reinsurance premium balances due Limited's clients. This contention is clearly controverted by the December 31, 1959, balance sheet of Limited which shows that as of that date, six months after the bond became effective, reinsurance premiums receivable were more than sufficient to pay reinsurance premium balances due clients. Thereafter, Limited's situation steadily deteriorated. Saul Greenfield, a Certified Public Accountant employed by the London underwriters with whom Clarke placed most of his reinsurance business, testified that during the years 1960, 1961, and 1962, transfers in excess of $500,000.00 were made from Limited's premium accounts to other Clarke corporations in violation of Section 125 of the Insurance Law of the State of New York, supra. H. Alexander Stebler, who managed Limited and Pan-American under Clarke's direction, testified that while Limited premium receipts were generally deposited into a separate premium account, that account was freely invaded for the purpose of making these large cash transfusions to Clarke's other ventures, and that Limited was insolvent at all times when these trans-

fers were made. The Receiver's claim of $277,308.00 was adequately documented by audit reports received in evidence and unrefuted. The Court finds that the foregoing transfers from Limited's premium account in excess of $500,000.00, made by or upon express instructions of Clarke at a time when Limited was insolvent, was a dishonest and fraudulent invasion of a trust fund clearly belonging to the underwriters with whom Clarke dealt, and a loss protected by Section 5 of the bond. The Receiver's claim of $277,308.00 is thereby clearly established.

■ In the case of Pan-American, the testimony parallels that with respect to Limited. The only difference between the two corporations seems to be that Pan-American's business originated in Latin America and its volume was substantially less than Limited's. Claimant's Exhibit 7 shows improper transfers from its premium account of $33,666.37 and Claimant's Exhibit 8 shows travel and entertainment expenses of $15,018.24 paid therefrom, for a total unauthorized expenditure of $48,684.61. As these expenditures were made from premiums funds at a time when Pan-American was insolvent, upon the express direction of Clarke, such disbursements from its premium account constituted a dishonest and fraudulent invasion of a trust fund belonging to the underwriters and a loss protected against by Section 5 of the bond. The Receiver's claim of $42,239.21 is thereby clearly established. In the case of both Limited and Pan-American, the uncontradicted evidence is that the claimed losses occurred after the bond came into effect.

Clearly, then, the actions of Clarke and his employees who cooperated with him in thus depleting the premium accounts of these three corporations, constituted "fraudulent and dishonest acts" as those terms are used in the bond. While it is undisputed that Stebler, Grundy and Mrs. Murphy received nothing other than their salaries, it is also a fact that they freely did Clarke's bidding, knowing that what was being done was dishonest.

Mr. Grundy and Mrs. Murphy testified that they knew of no other jobs available at the substantial salaries they were receiving from Clarke, so they continued to the end even though they were worried enough to consult a lawyer concerning the danger to them by reason of their complicity in Clarke's fraudulent schemes.

### 2. Losses Contemplated by the Bond

■ F. & D. contends that as these funds were withdrawn from the premium accounts and applied to "proper corporate purposes," and as all such transactions were properly recorded on the books of account of the various corporate insureds, no "loss" within the coverage and meaning of the bond occurred. This argument, in the light of the facts developed at the trial, is untenable.

In the inter-office communication at page 62 of claimants' Compound Exhibit 1 (specific portions of the Record on Appeal), F. & D. fully discusses the applicability of Section 5 of the bond (supra) to the various situations that later occurred:

"* * * in our opinion, the funds in the Premium Account, as well as the General Account, are covered against loss through any of the acts covered by our bond caused by employees of our Insured as defined therein. The premiums may belong to the members of the Pool and the profits, if any, are eventually distributed to them. Nevertheless, such funds constitute money 'belonging to the Insured, or in which the Insured has a pecuniary interest, or for which the Insured is legally liable, or held by the Insured in any capacity whether the Insured is legally liable therefor or not.' * * * In either case the funds in the Premium Account would be covered. * * * *If funds in the Premium Account are embezzled by its employees, therefore, we would reimburse our Insured for such funds either as property held by the Insured in any capacity or property as respects which it is legally liable to others, viz, the Pool's partic-*

*ipants.* In other words, such property is covered by the bond but not directly in favor of the Pool's participants." (Emphasis added)

While the letter referred only to the hail pool premium monies, F. & D. concedes that the reinsurance premiums held by Limited and Pan-American are governed by the same principles.

All of the claimed losses were suffered while the fidelity bond was in full force and effect. Although the named insureds were all insolvent at all times when the above described illegal transfers were being made, the case at bar is even stronger than that of Franklin Savings & Loan Company of Macon v. American Employers Insurance Company, supra. Premium funds here were held in a fiduciary capacity as trust funds for the various insurance companies doing business with the named insureds. These various insurance companies have claims totaling $631,171.79 which have been recognized as valid by the Flagler County Circuit Court as is shown by certified copies of its Orders filed in this cause. If the named insureds are to be indemnified against loss on account of dishonesty of their employees, then F. & D. must pay this amount to them in order for them to respond. This is what F. & D. said it would do, and it is hard to imagine a more fitting example for the application of Section 5 of the bond. As the premium money belonged to others, the language of that section is meaningless if F. & D. can successfully defend on the ground of no loss to the named insured. While the Receivership Orders do establish an economic loss to these insured corporations, by virtue of the express provisions of Section 5 of the bond it is not necessary that there be economic loss to them where there is misappropriation of money they are holding in trust.

## 3. *Clarke—the Alter Ego*

F. & D. argues that the fact that Clarke is the alter-ego of the named insureds eliminates its liability for any loss occasioned by Clarke, citing the companion cases of McKee v. American Casualty Co. (CCA 5th) 316 F.2d 428 and McKee v. Great American Ins. Co. (CCA 5th) 316 F.2d 473. However, there are three basic distinctions between the McKee situation and the case at bar. First, in McKee, the sole stockholder took money belonging to his solely owned corporations, thereby causing them to be unable to pay their general creditors. Here, Clarke misappropriated trust money held by his corporations but belonging to the pool participants and the underwriters group; compare Franklin Savings & Loan Co. v. American Employers Ins. Co., supra. Thus Clarke's stock ownership in the named insureds has nothing to do with the matter because the misappropriated money did not belong to the insureds, but to others. Secondly, McKee's corporations were in business for themselves, investing their own funds for their own account. In the case at bar, Clarke's corporations were in the business of managing large sums of money belonging to others and F. & D. knew it (R. 184). Finally, the wording of the bond in McKee read as follows: "Robert A. McKee, d/b/a Industrial Finance Corporation and Commercial Capital Corporation." In the case at bar, the named insureds were the various Clarke corporations. The significance of the wording of the McKee bond was explained by Wade H. Everhardt, Jr., the agent who wrote it. His uncontradicted testimony was that McKee came to him to obtain a bond protecting *himself* against stealing by his employees. Everhardt further testified that since McKee was the sole owner of all the stock, the bond was so written as to protect only McKee's interest:

"* * * He said that he was interested in protecting himself, because he was the sole owner of all the stock * * * so I suggested that the proper way to write his insurance to protect his interests, which was what we are primarily involved with, was to write the policies in the name of Robert A. McKee, dba Industrial Finance

Corporation and/or Commercial Capital Corporation." [2]

The above should be compared with Messinger's testimony that F. & D. intended to protect against theft by Clarke himself as well as by other employees:

"Q. And you collected a premium based on the fact, of course, that Clarke was one of the covered employees?

A. That is correct. (R. 181)

\* \* \* \* \* \*

Q. So what you were trying to insure was the named insureds, corporations all, against thievery by any employee, including Clarke?

A. That is correct." (R. 184)

Robert A. McKee was the insured, F. Wylly Clarke was a covered employee, and there is quite a difference. There is also a very substantial difference where those who suffer the ultimate loss, as in McKee, are the general creditors of the corporation as against the situation at hand where they are cestui que trustent. The rationale of McKee is this: the only thing that an alter ego stockholder could steal is money that does not belong to his wholly owned companies, as a man cannot steal from himself. Here, Clarke stole the only thing that he could steal—money that his wholly owned corporations held in trust for others.

There is yet another reason why this defense is unavailing to be gleaned from the admissions of Messinger, who testified after the so-called "Rossiter Reports" and the "Riggs Report" were made to F. & D. He said that at the time it wrote the bond F. & D. knew everything about Clarke's operation, including his stock ownership and the fact that he would be managing large sums of money belonging to others; that Clarke controlled the named insured corporations and that he was the only one in position to misappropriate a substan-

tial sum of money. (Obviously, that would be premium money.) Messinger stated that Clarke himself was a covered employee even though he was the sole stockholder and alter ego of the named insureds. He admitted this was unusual but F. & D. had "perfect experience" with Clarke's operation in the past and wanted his business. Perhaps F. & D., relying on its prior "perfect experience," felt the hazard was lessened because Clarke, "the sole stockholder and alter ego" was in control and, as the owner, he was vitally interested in the success of the named insured corporations. Regardless of its motive, F. & D. included Clarke as a covered employee and collected a premium for furnishing protection against misappropriation or dishonesty by him, with full knowledge of the entire operation.

While all of the facts were not before the Fifth Circuit Court of Appeals when this matter was before it, that Court did conclude that the mere fact that Clarke may be the alter ego of the insured corporations does not eliminate F. & D.'s liability. Developments at the trial strengthen the validity of that conclusion.

### 4. Officers—Knowledge and Collusion

F. & D. next contends that because the acts complained of were all done openly and were spread on the books of the various Clarke corporations, other "officers" of these corporations knew of these acts, thus causing coverage to be cancelled as to Clarke by the bringing into play of the "knowledge and discovery" provisions of Sections 6, 7 and 12 of the bond, supra. However, F. & D. knew when it wrote the bond that in the event of fraud by Clarke, there was no one to whom it could look or upon whom it could rely to give notice of such misconduct. F. & D. also knew that the only person who could steal anything of consequence was Clarke, and further knew that the only thing he could steal

---

**2.** Page 42 of the printed record on appeal to Fifth Circuit Court of Appeals in McKee v. Great American Ins. Co.

was the very substantial amount of premium deposits entrusted to the care of his corporations. By the very nature of the situation, with which F. & D. was fully aware, Clarke was the alter ego of these corporations and therefore clearly the only person "in authority." For the purposes of this suit, Sections 6, 7 and 12 of the bond are substantially the same. They invalidate coverage as to any employee from the time that his dishonesty is discovered by an officer not in collusion with him. Clarke was, in addition to being the "sole stockholder and alter ego" of the named insureds, a covered employee under the bond. Mr. Barnett was asked why these sections spoke in terms of "officer" or "partner" and he replied that knowledge had to come to someone "in authority" before the cancellation became effective:

"A. The reason for that is this, that a clerk if it did not specify someone in authority, some clerk might obtain that information and it would not be fair to the insured to claim or to have their liability terminated by reason of someone in a menial position knowing of dishonesty. It's to protect the corporation." (R. 213)

Thus, F. & D. did not contemplate the application of these cancellation clauses to a menial employee even though bearing a title. It is obvious that there were, as to theft by Clarke, no individuals "in authority" to whom the knowledge and discovery sections could apply. F. & D., well knowing Clarke's dominant position, elected to insure against *his* theft. The Fifth Circuit Court of Appeals in its Opinion observed:

"F. Wylly Clarke * * * controlled each corporation."

and the trial has certainly underlined this observation.

Since F. & D. knew Clarke was the sole stockholder and alter ego of the named insureds, it would seem that F. & D. waived the knowledge and discovery

provisions of their bond insofar as Clarke himself was concerned. This follows as a natural consequence. However, it is not necessary to decide this point because the testimony at the trial satisfies this Court that except for Clarke, there were no real officers of these corporations as that term is understood. He was the Alpha and Omega of the named insured corporations. His employees who held various titles, and thus were officers in name only, exercised no authority but simply did Clarke's bidding. He set the policies, he issued the orders, he made the decisions. He would brook no disagreements. While his subordinants grumbled among themselves about his actions, there was no open revolt because it was apparent that it was either "vote aye or resign." He would squelch any dissent by reminding his "officers" that he was the boss—that these were his companies—and that he would *decide* how the money would be spent. This Court finds that under the evidence and testimony presented, Clarke was the only officer of the named insureds as that term is used in the bond. It follows that the cancellation provisions of the bond did not apply.

However, even if there were officers other than Clarke, the cancellation provisions would not take effect. The only other "officers" that were proven to know of Clarke's misappropriation and dishonesty were Grundy, Stebler and Murphy, who were by their own testimony proven to be in collusion with him. In United States Fidelity & Guaranty v. Walker, (CCA 5th) 248 F. 42, 44, the Court dealt with a provision similar in import to Sections 6, 7 and 12. The Court observed:

"Nor are those provisions to be regarded as contemplating the giving of notice when the only representatives of the bank, who were apprised of the cashier's guilt of larceny or embezzlement, participated in or connived at his crime. Fidelity & Deposit [Ins.] Co. [of Maryland] v. Courtney, 186 U.S. 342, 361, 22 S.Ct. 833, 46 L.Ed. 1193."

In dealing with a knowledge and discovery bond provision that was identical to Section 12 of F. & D.'s bond, Judge Duffy, in Duel v. National Surety, supra, said, at page 967:

> "This provision has no application. No cancellation was effected thereby because, as the evidence shows, every other officer and employee of the insurance company, with respect to Kambe's acts, was in collusion with him."

F. & D. takes the position that because the transactions were spread upon the books, all officers had to know of Clarke's dishonest acts. This may, but does not necessarily, follow. Stebler testified that the books of Limited and Pan-American could be seen only by officers of the companies, but did not state that any other officers actually saw them. Grundy and Murphy testified that they never looked at the books. Because of the nature of their jobs, they knew what was going on. It is fair to speculate that other so-called officers may have known what was happening, but this does not eliminate the need for F. & D. to prove actual knowledge of Clarke's dishonesty, and this F. & D. has not done. It is just as reasonable to assume that those who may have had such knowledge were also willing participants in the over-all Clarke scheme and also kept their silence in order to continue on the payroll. In a somewhat similar bond suit, Insurance Company of North America v. Greenberg, 405 F.2d 330 (CCA 10th), the Court observed:

> "Although the classic loss under such a provision may well be an employee embezzlement for direct personal benefit we can read no such limitation into this bond. Surely the obtaining of appellees' money through fictitious assignments and the conversion of trust monies paid upon valid accounts constituted both fraud and dishonesty. And the money so obtained, after commingling with Oklahoma Steel's own money, indirectly reached the errant employees through payment of their corporate salaries."

While seemingly beyond the scope of the stipulated issues, F. & D. attempted to fashion a defense based upon its assertion that the bond never became effective as to Clarke because, it alleges, he was engaged in a course of dishonesty prior to June 29, 1959, the effective date of the bond. There are numerous factual as well as legal and logical flaws in this argument. In the first place, F. & D. attempted to prove this by the report of George Riggs. However, it became obvious at the trial that Mr. Riggs apparently did not understand the complexities of Clarke's operations, as has been noted above, or simply did not have all the facts, so that any evidence from him on this subject is of doubtful probative value. Any inference of prior dishonesty to be drawn from the Riggs report was wholly negated by the subsequent testimony of Barnett, given on deposition in February of 1966, nearly one year later:

> "A. * * * in the first place, let me say we have not seen what we consider any evidence of dishonesty * * * (R. 202)
>
> "Q. Now, then, it is your opinion that Mr. Clarke was guilty of misappropriation prior to June 29, 1959?
>
> "A. No, we don't know of any dishonesty on Mr. Clarke's part * * * (R. 212)
>
> "We have seen no proof of it, of dishonesty." (R. 212)

The pre-trial stipulation as to the facts with reference to bond coverage, entered into by the parties some four years after the Riggs report, stated:

> "That at all times material to this suit, said bond was in full force and effect. The employees covered under the bond specifically included by name and position, in addition to others: F. Wylly Clarke, Jr., sole stockholder * * *"

They also stipulated as issues of law on which there was agreement:

> "(b) Clarke was a covered employee under the bond.

(c) The bond was in full force and effect at all times material to this suit."

Such stipulations are wholly inconsistent with its position that Clarke was never covered. If, in fact, F. & D. ever had such a defense, these repeated stipulations surely constituted a waiver thereof. Even if F. & D. had not waived its attempted defense of prior dishonesty, this would raise serious questions under paragraph C of the General Agreements of the bond relating to F. & D.'s obligation to pick up losses occurring during coverage of the prior bond if discovered during the term of this bond. Messinger testified that F. & D. had bond coverage on Clarke's corporations from 1949 to 1956, which was then replaced by Lloyds until F. & D. recaptured the business in 1959. As interesting as these questions are, they need not be explored here.

It has become obvious to the Court that F. & D. has not known from the start of this matter to this point just what position it should take with respect to its coverage defenses. It is equally obvious that the printed form of bond issued by F. & D. simply does not fit the unusual circumstances of this case. F. & D., knowing of these anomalies and knowing that issuance of such a bond in a situation such as this was most unusual, walked into this loss with its eyes wide open. In its complaint, in paragraphs 12 and 14 thereof, F. & D. alleged that the entire bond was void ab initio. This position was confirmed by the F. & D. inter-office communication from A. K. Bennett to P. C. Symonds appearing at page 89 of the record exhibit. Barnett stated at the trial, however, that F. & D. had never taken the position that the bond had never become effective and inferred that Mr. Bennett didn't know what he was talking about. However, Messinger confirmed that F. & D.'s home office did, indeed, take that position. As Mr. Barnett was F. & D.'s claims attorney who appears throughout the record to have been in charge of this case from the start, the Court must assume that he also knew of the afore-said allegations of paragraphs 12 and 14 of the complaint, which are binding upon F. & D.

Either the bond was effective or it was void, and F. & D. is found on both sides of this issue. It has alleged one way, stipulated the other, and testified both ways. This Court concludes that the bond was effective when issued. Either Clarke was covered or he was not, and F. & D. is also found on both sides of this issue. This Court concludes that Clarke was covered by the bond.

Although F. & D. was given the right to raise all of these varied defenses over the strenuous and well-reasoned objections of the claimants based upon F. & D.'s failure to return any portion of the premiums it charged for the bond or for affording coverage of Clarke, F. & D. has wholly failed to establish any of them.

## 5. Bond Coverage

As noted above, coverage of the bond was $100,000.00 as to each of the insureds' employees involved in the covered losses plus $400,000.00 of excess coverage. As Claimants have established the direct involvement in these established losses of four such employees, the coverage thus available to the Claimants is $800,000.00. Interest, costs and attorneys' fees would not be limited by this amount.

## 6. Interest

Under the provisions of the bond, no action lies against F. & D. until ninety days after the filing of proofs of loss. As F. & D. filed its complaint for a declaratory judgment before expiration of that time period wherein it denied all liability to the claimants this action matured the claimants' rights, and interest on the established claims shall be computed from August 30, 1963, to the date of the entry of final judgment. F. & D. makes some contention that no interest should be allowed during the period of time consumed by the appeal, but this contention cannot be sustained.

Judgments in the amount of $311,624.-58 in favor of Barbara B. Murphy as Receiver for USAFORM Hail Pool, Inc.; $277,308.43 in favor of Barbara B. Murphy as Receiver for U. S. & Foreign Management, Ltd.; and $42,239.21 in favor of USAFORM Pan-American, Ltd.; together with interest, and costs as hereinafter determined, will be entered upon submission of proof respecting costs.