551 A.2d 881

UNITED STATES FIDELITY & GUARANTY COMPANY, et al.

v.

THREE GARDEN VILLAGE LIMITED
PARTNERSHIP, et al.

No. 515, Sept. Term, 1988.

Court of Special Appeals of Maryland.

Jan. 9, 1989.

Howard G. Goldberg (Douglas N. Silber and Smith, Somerville & Case, on the brief), Baltimore, for appellants.

Pamela R. Johnson (George C. Courtot and Kroll & Tract, on the brief), Baltimore, for appellees, Riggs, Counselman, Michaels & Downes, Inc.

Robert W. Hesselbacher, Jr. (Elliott B. Adler and Laxalt, Washington, Perito & Dubuc on the brief), Washington, D.C., for appellee, Yorkville Corp.

Price O. Gielen, Holly N. Lindeman, Nancy S. Friedman, Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A. and Alan M. Grochal, on the brief, Baltimore, for appellees Three Garden Village Ltd. Partnership and First Baltimore Asset Management, Inc.

Argued before MOYLAN, GARRITY and POLLITT, JJ.

GARRITY, Judge.

This case had its inception when Thomas Richard Stitt (Stitt), the sole stockholder, sole director, and sole officer of First Baltimore Asset Management, Inc. (First Baltimore), a company formed to manage apartment projects, improperly

used funds held by First Baltimore on behalf of Three Garden Village Limited Partnership (Three Garden Village) and Yorkville Corporation (Yorkville). Thereafter, First Baltimore made claim against United States Fidelity and Guaranty Company (USF & G), the surety under a fidelity bond covering defalcations of employees. Three Garden Village and Yorkville also made claims against USF & G. USF & G denied coverage on the ground that Stitt could not be classified as an "employee" under the bond.

Three Garden Village and First Baltimore brought suit against USF & G and Riggs, Counselman, Michaels and Downes (Riggs). The suit sought damages from USF & G based upon the issuance by USF & G of the fidelity bond to First Baltimore. The suit also sought damages from Riggs, who was First Baltimore's insurance agent with respect to the bond. USF & G filed a third-party complaint for indemnification from Stitt and counterclaimed against Three Garden Village, First Baltimore and Yorkville seeking a declaratory judgment that neither the plaintiffs nor Yorkville had any rights against USF & G under the bond.[1]

After the denial of USF & G's motion for summary judgment, the plaintiffs filed a motion for summary judgment against USF & G arguing that they were entitled to judgment as a matter of law because the material facts were undisputed and the court's denial of USF & G's motion had resolved the legal issues in the plaintiffs' favor. The Circuit Court for Baltimore City (Ward, J.) granted the plaintiffs' motion. In addition, Riggs filed a motion for summary judgment against the plaintiffs. The court granted Riggs' motion. Pursuant to an order on March 14, 1988, judgment was entered in favor of First Baltimore in the

---

**1.** Yorkville had filed suit against First Baltimore in the Circuit Court for Fairfax County, Virginia. Judgment was subsequently entered in favor of Yorkville against First Baltimore in the amount of $139,000. Yorkville was brought into this case as a counter-defendant by USF & G when USF & G filed its amended counterclaim. Three Garden Village, First Baltimore, and Yorkville will be referred to in this opinion collectively as "the plaintiffs."

amount of $14,256.46, in favor of Three Garden Village in the amount of $123,497.90, and in favor of Yorkville in the amount of $139,000.

USF & G noted an appeal to this court. The plaintiffs also noted an appeal from the summary judgment in favor of Riggs. Relevant to our review of the case *sub judice* is the following question posed by USF & G:

> Did the trial court err by denying USF & G's motion for summary judgment because Stitt was not a covered "employee", as that term was defined in the fidelity bond, during the period when he misappropriated client funds? [2]

In addition, the plaintiffs, as cross-appellants, present the following question for our review:

> If this court reverses the trial court's entry of judgment against USF & G, should this court consequently reverse the trial court's entry of judgment in favor of Riggs, thus reinstating the plaintiffs' claims against Riggs?

## FACTS

The nature of this case requires us to detail the background of the fidelity bond and Stitt's subsequent defalcations.

First Baltimore was originally formed by Stitt and Albert DeSalvo (DeSalvo) in 1981.[3] At the time of its formation, Stitt was the president and treasurer of First Baltimore and owned forty-nine percent of its stock; DeSalvo was the vice president and chief operating officer of First Baltimore and owned fifty-one percent of its stock.

From the time of its formation, the business of First Baltimore involved acting as real estate manager for owners of apartment complexes in the Baltimore and Washington metropolitan areas. Generally, First Baltimore collect-

---

**2.** We do not address USF & G's other arguments because of our holding with respect to this question.

**3.** Prior to October 1983, First Baltimore was called Urban Asset Management, Inc.

ed rents, paid bills, provided maintenance and handled ad-. ministrative tasks on behalf of its clients. In order to facilitate First Baltimore's management of a property, each client would establish a bank account denoting First Baltimore as its agent. First Baltimore would then establish a separate "agency" account under its own name to deposit rents received from each client's property. First Baltimore was responsible for remitting rental proceeds, less expenses, to each client on a periodic basis.

In August 1985, the ownership and management structure of First Baltimore changed significantly. At that time, Stitt purchased all the stock of First Baltimore owned by DeSalvo and the latter resigned as an officer and director of First Baltimore. Consequently, from August, 1985, Stitt was the sole stockholder, sole officer, and sole director of First Baltimore.

Two of First Baltimore's clients were Three Garden Village and Yorkville. On December 4, 1985, First Baltimore entered into an agreement with Yorkville to manage Yorkville's property in Fairfax, Virginia. On December 19, 1985, First Baltimore agreed to manage Three Garden Village's apartment complex in Baltimore County. As with First Baltimore's other clients, Three Garden Village and Yorkville established banking or checking accounts denoting First Baltimore as agent.

### The Misappropriations

The defalcations which are the subject of the present litigation commenced in January 1986. In particular, on January 21, 1986, Stitt began a string of misappropriations from the Three Garden Village and Yorkville accounts.[4]

---

4. In 1985, before Stitt had bought out DeSalvo's stock interests in First Baltimore, Stitt had misappropriated funds from the account of another client—Bethany Apartments—for the purpose of purchasing property where First Baltimore had its offices. These funds were eventually replaced with funds withdrawn from Yorkville's account. Thus, no litigation resulted from the Bethany Apartments misappropriation.

The misappropriations of Three Garden Village's funds first occurred on January 21, 1986. On that date, Stitt wrote a check for $50,000 on Three Garden Village's operating account at Standard Federal Savings and Loan and transferred it into First Baltimore's account at Equitable Bank. These funds were then transferred from the First Baltimore account to a separate escrow account which had been established partly for the purpose of purchasing an apartment complex called Western Run.[5] On January 22, 1986, Stitt withdrew $10,000 from Three Garden Village's account. This money was also used to further First Baltimore's interest in purchasing Western Run. On July 16, 1986, Stitt used $13,500 of Three Garden Village funds to pay Malloney Air Services for a new compressor for the air conditioner at First Baltimore's offices. Finally, on July 31, 1986, Stitt again withdrew $50,000 from the Three Garden Village account with the purpose of applying the funds towards the purchase of Western Run.[6]

Stitt's misappropriations of Yorkville's funds also commenced on January 21, 1986. On that date, Stitt transferred $40,000 from a Yorkville money market account to First Baltimore's account at Equitable Bank. These funds were used by First Baltimore for the Western Run project. Subsequently, between July 25 and 30, 1986, Stitt withdrew three additional checks, in the amount of $50,000, $30,000

**5.** Stitt had been actively pursuing the acquisition of the Western Run property as early as August 1985. Western Run had been owned by the now-defunct Old Court Savings and Loan and had been offered for sale by the Maryland Deposit Insurance Fund Corporation. It was intended that First Baltimore would become a general partner of a partnership to be formed for the purpose of purchasing Western Run; First Baltimore would then enter into an agreement with the newly formed partnership to manage Western Run.

**6.** In addition to the misappropriations perpetrated by Stitt, on May 8, 1986, the Internal Revenue Service mistakenly issued a levy on and seized $25,743.43 from a Three Garden Village account to recover tax obligations owed by First Baltimore. The funds wrongfully seized were refunded to Three Garden Village in January 1988. Accordingly, Three Garden Village's claim against USF & G was reduced by that amount.

and $10,000, from Yorkville's Fairfax Savings Association account. The $50,000 and $10,000 checks were applied toward the purchase of Western Run. The $30,000 check was used, at least in part, to repay funds Stitt had previously misappropriated from the Bethany Apartments account.[7]

*Application and Issuance of the Fidelity Bond*

First Baltimore obtained the fidelity bond at issue in the present case through Riggs, its insurance agent.

In the fall of 1983, William Bryant (Bryant), at that time First Baltimore's comptroller, contacted James Payne Hindsley (Hindsley), a Riggs insurance broker, to discuss insurance coverage for the newly formed property management company. As a result of his meeting with Bryant, Hindsley understood that Bryant, Stitt and DeSalvo were principals of First Baltimore. Hindsley also had discussions with Stitt and DeSalvo during the fall of 1983. As a result of these discussions, Hindsley understood that First Baltimore sought a fidelity bond to fulfill HUD requirements for bonding its clients as well as First Baltimore as their manager.

On October 31, 1983, Hindsley sent a memo to Robert Noeth (Noeth), the head of Riggs' fidelity underwriting department, pertaining to the fidelity bond sought by First Baltimore. In that memo, Hindsley advised Noeth that First Baltimore had six employees, including three principals who had equal ownership in the company.[8]

On May 22, 1984, Hindsley and Noeth met with Stitt at First Baltimore's offices for the purpose of developing information necessary to place the fidelity bond. During the meeting, an application for a $1,000,000 fidelity bond was completed on a form entitled "Application—Question-

---

7. See note 4, *supra*.

8. Hindsley admittedly never confirmed the ownership structure of First Baltimore or knew the percentage of stock owned by each principal, but rather operated under the assumption that Bryant, Stitt and DeSalvo were principals of the company.

naire for a Commercial Blanket Bond." Question 1(f) of the Application stated: "If any officer or employee owns more than 10% of the stock of the Applicant, give name and percentage." The space on the application for answering this question was left blank. Despite his assumption that First Baltimore had three principals having equal ownership, Hindsley admittedly did not ask Stitt to supply this information. The application was signed by Stitt, as president of First Baltimore, at the conclusion of the meeting.

Shortly thereafter, Riggs decided to place the fidelity bond for First Baltimore with USF & G.[9] At the time, Riggs was an agent for USF & G having a line of authority to make underwriting decisions and issue policies of fidelity insurance for up to $250,000. Riggs had no authority to issue a bond exceeding $250,000 without first obtaining approval from USF & G's home office. As the fidelity bond requested by First Baltimore was for $1,000,000, it was beyond Riggs' authority to issue. Thus, shortly after the meeting with Stitt, Noeth met with Mr. Theodore Parks (Parks), a fidelity underwriter at USF & G, to discuss First Baltimore's application. Noeth informed Parks that First Baltimore had *three* principals with equal ownership. Noeth also told Parks that First Baltimore had excellent internal controls, that no one person had control over the entire corporation, and that all three principals (apparently Bryant, Still and DeSalvo) were involved in the daily management of the company. Based upon Noeth's statements, Parks approved the issuance of a $1,000,000 fidelity bond to First Baltimore.[10]

---

**9.** We note that Riggs had the option of placing the fidelity coverage requested by First Baltimore with any of a number of insurance companies with which Riggs dealt.

**10.** Parks testified that when he approved the issuance of the fidelity bond, he was unaware that there were only two, not three, owners of First Baltimore, and that had he been aware when the application was submitted that, instead of three equal owners, First Baltimore had only two owners, one owning fifty-one percent of the company and the other owning forty-nine percent, he would not have approved the

Upon receiving approval from Parks, Riggs prepared and issued a $1,000,000 fidelity bond to First Baltimore. The effective date of the bond was July 1, 1984.

On September 8, 1986, First Baltimore formally advised Riggs that it had sustained a loss of approximately $300,000 and would be making a claim against the bond. First Baltimore, Three Garden Village, and Yorkville made claims against USF & G for Stitt's misappropriations of Three Garden Village and Yorkville funds. USF & G denied coverage under the bond because the losses resulted from Stitt's acts.

## DISCUSSION OF LAW
### I.  *USF & G's Appeal*

USF & G argues that the trial court erred by denying its motion for summary judgment because Stitt was not a covered "employee," as that term was defined in the bond, during the period when he misappropriated client funds.

In the instant case, the following material facts are not subject to dispute between USF & G and the plaintiffs: First, as of August 1985, and throughout his course of conduct in 1986, Stitt was the sole stockholder, sole officer and sole director of First Baltimore. Second, the bond's coverage is unequivocally limited to "[l]oss of Money, Securities, and other property which the Insured shall sustain ... resulting directly from one or more fraudulent or dishonest acts committed by an Employee, acting alone or in

issuance of the bond. Parks further testified that had he been aware at the time of the application that Stitt was the managing officer of First Baltimore and exercised virtually unchecked control over the company, USF & G's underwriting practices would have required that Stitt be specifically excluded from the coverage of the bond. Apparently, Parks' first indication that First Baltimore had less than three equal owners was not until April or May 1986, when Noeth informed him that Stitt, then the one hundred percent owner of First Baltimore, may have misappropriated client funds. Parks advised Noeth at that time that if the allegations were true, USF & G would deny coverage for Stitt's acts.

collusion with others." Third, the bond, in relevant part, defines an "employee" as

any natural person ... while in the regular service of the Insured in the ordinary course of the Insured's business during the Policy Period and whom the Insured compensates by salary, wages or commissions and has the right to govern and direct in the performance of such service. ...

■ The question in the case *sub judice* thus becomes whether, as a matter of law, Stitt was an "employee" as that term was defined in the bond. The parties agree that our interpretation of "the right to govern and control" requirement contained in the definition is determinative to the resolution of that question.

In the factually similar case of *Kerr v. Aetna Casualty & Surety Company,* 350 F.2d 146 (4th Cir.1965), the Fourth Circuit Court of Appeals considered whether certain individuals were covered employees under a fidelity bond. *Kerr* concerned an action by a trustee in bankruptcy to recover, under a fidelity bond issued to a corporation, for losses resulting from acts of individuals who effectively controlled the insured's stock, were its sole directors, and held positions as its chief executive officers. *Id.* at 154. Materially similar to the USF & G bond, the fidelity insurance in *Kerr* defined "employees" covered by the bond as "officers, clerks and other natural persons in the service of the Insured ... who are compensated by salary, wages or commissions *and whom the Insured has the right to govern and direct at all times in the performance of such service....*" *Id.* at 149, 154 (emphasis added). The trial court found that the insured had sustained a compensable loss resulting from the dishonest and fraudulent acts of A.D. Cudd, Jr. and William D. Coan, the sole directors and controlling shareholders of the insured. On appeal, the insurer argued that there could be no recovery for the losses because the insured's only directors and controlling shareholders were not "employees" of the insured as that

term was defined in the fidelity bond. *Id.* at 154. The Fourth Circuit noted that Cudd and Coan were officers of the insured and received salaries from the company. The court further observed, "[n]ot only were they the principal officers of [the insured], they were also its only directors and owned 75% of its stock, the remainder being held by a private corporation which they owned." *Id.* The Fourth Circuit concluded that Cudd and Coan were not "employees" as contemplated by express terms of the fidelity bond and, therefore, that losses incurred by the insured as a result of their acts were not covered by the bond:

> As shareholders of [the insured], Cudd and Coan elected themselves as its sole directors, and as directors they elected themselves its chief executive officers. Since the charter gave the directors the right to manage and control the corporation, Cudd and Coan as directors probably had the right to control Cudd and Coan as officers, *but such a theoretical and unrealistic right of control did not make Cudd and Coan "Employees" of [the insured] covered by the bond.* Such a bond is not intended to cover the fraud and dishonesty of men who are in effect the sole stockholders, as well as the only directors of a closely held corporation. As noted above, the bond is intended to protect the corporation from the fraud or dishonesty of its employees, not to protect its creditors from the fraud or dishonesty of its stockholders and directors. We could not agree with the [lower court] that the claim of loss ... resulted from the activities of Cudd and Coan as "Employees" of [the insured].

*Id.* at 154–55. (Emphasis added).

█ In our opinion, the import of *Kerr* is quite clear. The decision stands for the proposition that an "employee," as that term was defined in a fidelity bond materially similar to the USF & G bond, is an individual who, in actuality, is subject to the control and direction of the

insured.[11]

The plaintiffs have cited other case law in an attempt to undermine the import of *Kerr* with respect to the present case. The Eighth Circuit's decision in *General Finance Corp. v. Fidelity Casualty Co. of New York,* 439 F.2d 981 (8th Cir.1971), however, is distinguishable from *Kerr* and the case *sub judice* on several grounds, not the least compelling of which is the fact that the insured corporation in *General Finance* had a separate board of directors of which the dishonest majority stockholder was not the sole member. Likewise, the *USAFORM Hail Pool* decisions [12] cited by the plaintiffs are distinguishable from *Kerr* and the instant case. In *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.,* 318 F.Supp. 1301 (M.D.Fla. 1970), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976), the trial court held a fidelity insurer liable under

---

**11.** In *Whitehead v. Safway Steel Products,* 304 Md. 67, 77–78, 497 A.2d 803 (1985), a case decided under worker's compensation laws, the Court of Appeals stated:

This Court has traditionally considered five criteria in determining whether or not an employer/employee relationship exists between two parties ...: (1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power control the employee's conduct, and (5) whether the work is part of the regular business of the employer.... (citation omitted).

Of the five factors, the factor of control stands out as the most important ... [W]hether the employer "has the right to control and direct the employee in the performance of the work and in the manner in which the work is to be done" is the "decisive" or "controlling" test. (citations omitted).

**12.** The five separate reported opinions in this case are *American Empire Insurance Co. of South Dakota v. Fidelity & Deposit Co. of Maryland,* 408 F.2d 72 (5th Cir.), *cert. denied,* 396 U.S. 818, 90 S.Ct. 55, 24 L.Ed.2d 69 (1969); *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.,* 318 F.Supp. 1301 (M.D.Fla.1970), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976); *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.,* 463 F.2d 4 (5th Cir.1972), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976); *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.,* 523 F.2d 744 (5th Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976); and *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.,* 465 F.Supp. 478 (M.D.Fla.1979).

a bond where the dishonest and fraudulent acts were perpetrated by one F. Wylly Clarke, who was at all times the "alter ego" of the insured. In that decision, however, Clarke was stipulated to be a covered employee by the parties in the case, a factual scenario notably absent in the present appeal. In *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.*, 463 F.2d 4 (5th Cir.1972), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976), and *Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.*, 523 F.2d 744 (5th Cir.1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976), the appellate court did not consider whether Clarke was a covered employee.

Our decision, with respect to the present question, will be guided by the Fourth Circuit's opinion in *Kerr*, as we believe its reasoning to be sound.[13] Under the fidelity bond issued by USF & G, we construe the term "employee" to

---

13. The plaintiffs make several additional arguments against our application of *Kerr* in the present case. First, they argue that the bond covered losses caused by Stitt's acts because USF & G intended to cover Stitt while knowing he had substantial ownership and control of First Baltimore. We believe that this contention is contrary to the undisputed facts contained in the record. Second, the plaintiffs argue that because Stitt was initially intended to be a covered "employee," his subsequent elevation to the status of sole stockholder, sole shareholder and sole director was insufficient grounds to exclude him as a covered "employee." We believe a reasonable reading of the bond demands the conclusion that the determination of whether Stitt was a covered "employee" was properly made at the time of the subject occurrence. *See General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306 (1985). Third, the plaintiffs argue that USF & G should be estopped from denying coverage for Stitt's acts when Hindsley, an employee of Riggs, stated in a December 1985 letter that Stitt was still covered by the bond. We believe that Stitt could not have justifiably relied upon Hindsley's letter to modify the express terms of the fidelity bond in view of the strict limitation on modifications set forth in Section 19 of the bond. Finally, the plaintiffs argue that USF & G's acceptance of a third premium installment, after being put on notice that Stitt had acquired a controlling interest in First Baltimore, estopped USF & G from denying coverage because Stitt was not a covered "employee." We reject this argument because the bond clearly covered other individuals who were still "employees" of First Baltimore within the bond's express terms.

mean an individual who, in actuality, is subject to the control and direction of an insured company.

In the case *sub judice*, the undisputed facts are that Stitt was, at all relevant times, the sole stockholder, sole director, and sole officer of First Baltimore. As such, the facts of the instant case are even more compelling against "employee" status than those found in *Kerr*, where the insured company had several other officers. It is clear to us that although First Baltimore may have had theoretical authority over its sole officer and director, who was also its sole stockholder, it did not realistically have an actual right to control and direct Stitt, its alter ego, during the time when he misappropriated client funds. We hold, as a matter of law, that Stitt was not an "employee" as that term was used in the fidelity bond. The trial court erred, therefore, when it denied USF & G's motion for summary judgment.[14]

### IV. *The Plaintiffs' Appeal*

As a consequence of our holding *supra*, the plaintiffs (Three Garden Village, First Baltimore, and Yorkville) urge this court to reverse the trial court's entry of judgment in favor of Riggs, thus reinstating the plaintiffs' claims against that party.

As evidenced by its March 14, 1988 order, the trial court granted Riggs' motion for summary judgment against the plaintiffs by reason of the judgment it had entered against USF & G. Nothing contained in the record indicates to us that the trial court considered the merits of the plaintiffs' claims against Riggs. In light of our holding as to the lack of coverage under the fidelity bond, therefore, we shall reverse the judgment in favor of Riggs, thus reinstating the plaintiffs' claims against that party. In reversing, we do

---

**14.** Our holding obviates the need to consider other arguments raised by USF & G. In addition, our holding on this issue moots the plaintiffs' contention that the trial court erred in not awarding prejudgment interest.

not intimate any opinion as to the merits of the plaintiffs' case against Riggs.

JUDGMENT AGAINST UNITED STATES FIDELITY AND GUARANTY COMPANY AND IN FAVOR OF FIRST BALTIMORE ASSET MANAGEMENT, INC., THREE GARDEN VILLAGE LIMITED PARTNERSHIP, AND YORKVILLE CORPORATION, REVERSED. COSTS TO BE PAID BY APPELLEES IN EQUAL AMOUNTS.

JUDGMENT AGAINST UNITED STATES FIDELITY AND GUARANTY COMPANY AND IN FAVOR OF FIRST BALTIMORE ASSET MANAGEMENT, INC. AND YORKVILLE CORPORATION AS TO THE AMENDED COUNTERCLAIM, REVERSED. COSTS TO BE PAID BY APPELLEES IN EQUAL AMOUNTS.

JUDGMENT AGAINST FIRST BALTIMORE ASSET MANAGEMENT, INC., THREE GARDEN VILLAGE LIMITED PARTNERSHIP, AND YORKVILLE CORPORATION IN FAVOR OF RIGGS, REVERSED. APPELLEE TO PAY COSTS.

CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.