567 A.2d 85

THREE GARDEN VILLAGE LTD PARTNERSHIP et al.

v.

UNITED STATES FIDELITY & GUARANTY COMPANY.

No. 22, Sept. Term, 1989.

Court of Appeals of Maryland.

Dec. 21, 1989.

Price O. Gielen (Melnicove, Kaufman, Weiner & Smouse, P.A., Baltimore, Elliott B. Adler, Robert W. Hesselbacher, Jr., Laxalt,. Washington, Perito & Dubuc, all on brief), Washington, D.C., for petitioner.

Howard G. Goldberg (Douglas N. Silber, Smith, Somerville & Case, all on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

The substantive legal issue in this case is whether a commercial, blanket, fidelity bond issued to a corporation covers embezzlements by the corporation's sole stockholder, officer and director. There are, however, procedural complications. The trial court granted summary judgment against the insurer in favor of the claimants on the bond, and denied summary judgment for the insurer. The insurer seeks to overturn both rulings. Because the record presently reveals no breach by the insurer of the express, written contract, the circuit court erred in granting summary judgment against the insurer. Nevertheless, we do not direct entry of summary judgment for the insurer for two reasons. The first recognizes the trial court's discretion to deny, or defer entry of, a summary judgment which otherwise might be appropriately entered. Second, there is a theory of estoppel alleged in the complaint which has not been adjudicated in the trial court. Accordingly, we shall remand for further proceedings.

This action was initiated by two of the petitioners, Three Garden Village Limited Partnership (Three Garden) and First Baltimore Asset Management, Inc. (First Baltimore). First Baltimore's business was property management, including rent collection and property maintenance and repair. Three Garden owned a large apartment project in Baltimore County and engaged First Baltimore to manage the property. First Baltimore also managed property in northern Virginia owned by the third petitioner, Yorkville Corporation (Yorkville). First Baltimore managed two apartment complexes in Baltimore City respectively owned by Ready Avenue Limited Partnership (Ready) and Union Avenue Limited Partnership (Union). Ready and Union are not parties to this action, but they became claimants against the bond in issue here.

The defendants are the respondents, United States Fidelity and Guaranty Company (USF & G) and Riggs, Counselman, Michaels & Downes, Inc. (RCM & D). USF & G had issued through RCM & D, one of its general agents, a commercial, blanket, fidelity bond under which First Baltimore was the named insured. The dispute involves the issuance, legal effect, and continuation in force of that policy. We state the facts of the dispute most favorably to USF & G, the party which opposed the grant of the principal summary judgment involved in this appeal.

First Baltimore was incorporated in 1981 by Thomas Stitt (Stitt) and Albert DeSalvo (DeSalvo). Stitt owned forty-nine percent of the stock, and DeSalvo owned fifty-one percent. Both worked in the business. First Baltimore specialized in managing rehabilitated properties occupied by low to middle income residents. Some or all of the properties had benefited, or continued to benefit, from one or more forms of subsidy provided by the United States Department of Housing and Urban Development (HUD).

In the latter part of 1983 Joseph Payne Hindsley (Hindsley), a representative of RCM & D, was advising First Baltimore concerning its property, casualty and workers' compensation insurance needs. At that time First Balti-

more asked Hindsley if First Baltimore could obtain $1 million of fidelity coverage. Hindsley consulted with Robert J. Noeth (Noeth), manager of the bond department at RCM & D. In written memoranda Hindsley advised Noeth that there were six employees at First Baltimore, three of whom were clerical employees and three of whom were principals. Noeth made a longhand notation on one of the memos that each principal held an equal ownership interest in the corporation.[1]

In late May 1984, Stitt, on behalf of First Baltimore, signed an application to USF & G for a commercial, blanket bond in the amount of $1 million. The application was prepared for his signature by RCM & D. A question on the application asking the identity of any shareholder owning more than ten percent of the applicant's stock was left unanswered. The application reflected a total of eight employees of whom one was described as president, one as vice president and one as comptroller.

Because issuance of $1 million of coverage exceeded RCM & D's authority from USF & G, Noeth presented First Baltimore's application to Theodore G. Parks (Parks), an assistant vice president of USF & G. In a face-to-face meeting Noeth told Parks that three individuals equally owned First Baltimore. Parks approved the policy.

In that meeting Noeth also told Parks that RCM & D had been informed that HUD required the bond. Noeth testified further on deposition as follows:

"Q. ... When you told him that HUD required the bond, what, if anything, else did you tell him about HUD and what part they played in this business and why they required this bond?

"A. Because they were I believe insuring all of the mortgages.

---

1. Noeth's source, if any, of this information is an unresolved factual question.

"Q. Was there any discussion with Mr. Parks whereby he understood that the business of First Baltimore was basically as property managers pursuant to which they were routinely entrusted with the monies that belonged to other persons or partnerships and that they held the money in a trust capacity for them or in a fiduciary capacity? Did he understand that?

"A. Yes, he did.

"Q. Was that specifically discussed?

"A. Yes, because I mentioned that out of that trust before funds were paid to the mortgagees that various expenses were paid for maintenance, et cetera."

The policy was issued effective July 1, 1984. It is a "Comprehensive Dishonesty, Disappearance and Destruction Policy—Form A" in which only "Insuring Agreement I[,] Employee Dishonesty Coverage—Form A" is designated as effective. There is no expiration date. The policy remains in effect unless and until cancelled by either party. The premium for the First Baltimore policy was calculated to include the assumed three owners among the total number of employees whose defalcations would be covered. The premium was calculated for, and remained fixed for, a three year period but was payable in annual installments.

Under the policy USF & G agreed with First Baltimore to pay First Baltimore for:

"I. Loss of Money, Securities and other property which the Insured shall sustain ... resulting directly from one or more fraudulent or dishonest acts committed by an Employee, acting alone or in collusion with others."

The policy defines "Employee" to mean

"any natural person (except a director or trustee of the Insured, if a corporation, who is not also an officer or employee thereof in some other capacity) while in the regular service of the Insured in the ordinary course of the Insured's business during the Policy Period and whom the Insured compensates by salary, wages or commissions *and has the right to govern and direct in the*

*performance of such service,* but does not mean any broker, factor, commission merchant, consignee, contractor or other agent or representative of the same general character."

(Emphasis added).

In August 1985 Stitt purchased DeSalvo's stock in First Baltimore, and DeSalvo completely terminated his relationship with First Baltimore. By that time the comptroller position identified on the application was no longer filled. Thereafter Stitt was the sole shareholder, director and officer of First Baltimore. By early November 1985 Hindsley was aware of the fact that DeSalvo had left First Baltimore and was living in New York.

In December 1985 the general partner of Three Garden wanted assurance from First Baltimore that its fidelity bond protected Three Garden in the event of misappropriation of Three Garden funds held by First Baltimore in a fiduciary capacity. Stitt wrote to Hindsley requesting that a copy of the fidelity bond be sent to Three Garden listing Three Garden as an additional insured with First Baltimore, as their interests might appear. Hindsley consulted with Noeth. They concluded that Three Garden could not be named as an additional insured because fidelity bonds could not be written in that manner. They also concluded that the existing bond protected Three Garden, even if Stitt were to embezzle Three Garden funds, because the bond did not exclude coverage for the principals of First Baltimore. On December 31 Hindsley wrote Stitt, as president of First Baltimore, and advised:

"As respects your Fidelity Bond, it is not possible to name a client such as 3 Garden Village as an additional insured. Your bond, however, does respond for the acts of you and your employees in managing funds entrusted to you by your client projects."

Beginning in January 1986 and ending in late July 1986 Stitt made a series of misappropriations from the accounts of First Baltimore's customers which are the subject of this

litigation.[2] The funds taken belonged to Three Garden ($123,499.90), Yorkville ($139,000), Union ($10,000), and Ready ($4,256.46). The bulk of the funds were used as a deposit, later forfeited, in an attempt to purchase an apartment complex in a receivership sale.

RCM & D billed, and First Baltimore remitted, the third annual premium on the policy in June 1986.

In August 1986 Three Garden discovered the embezzlement of its funds in a review of First Baltimore's reports and accountings. Three Garden telephoned Noeth at RCM & D to verify coverage. Noeth telephoned Parks at USF & G. At that time Parks first learned that Stitt was the sole owner of First Baltimore. Parks informed Noeth that USF & G would not confirm that any coverage existed. On September 8, 1986, Noeth, as attorney in fact for USF & G, sent written notice to First Baltimore that the policy was cancelled effective September 25 in accordance with its terms.[3] The day after the cancellation notice was sent Hindsley wrote to the claims manager at USF & G expressing Hindsley's opinion that the policy covered the loss.

The instant petitioners made claim against USF & G which denied coverage primarily because Stitt, at the time of the loss, was not an "employee" of First Baltimore as defined in the policy. Stitt engaged personal counsel and, thereafter, seems fully to have cooperated with the petition-

---

**2.** In 1985, before Stitt had bought out Desalvo, Stitt had misappropriated funds from the account of another First Baltimore client, Bethany Apartments, for the purpose of purchasing property where First Baltimore had its offices. These funds were eventually replaced with monies withdrawn from Yorkville's account.

**3.** The petitioners rely on testimony by Parks at deposition which places the telephone call to him from Noeth in April or May of 1986. From this they argue that USF & G had actual knowledge that Stitt was the sole owner of First Baltimore prior to receipt by RCM & D of First Baltimore's third annual premium. A fact finder could conclude that Parks was mistaken in fixing the date, and that the conversation did not take place until after the misappropriations had been discovered by Three Garden.

ers in pressing their claims. First Baltimore was eventually placed in receivership.

Three Garden and First Baltimore, the latter asserting in its name the losses sustained by Ready and Union, sued USF & G and RCM & D in the Circuit Court for Baltimore City. Count I of the complaint, as amended, alleges a breach by USF & G of the express contract of insurance. Count II alleged a spurious tort claim on which USF & G obtained a summary judgment which is not questioned on this appeal. Count III essentially alleges an estoppel resulting in coverage for those property owners from which Stitt embezzled. That count imputes the knowledge of RCM & D and its personnel to USF & G and alleges justifiable reliance by the plaintiffs. Counts IV and V claim only against RCM & D, alternatively in contract and in tort, and essentially allege insurance broker malpractice.

USF & G impleaded Stitt as a third party defendant. USF & G also filed a counterclaim. Its first count sought rescission of the insurance policy. The second count sought a declaratory judgment that the insurer had no liability under the policy. Joined as an additional counterclaim defendant to that count was Yorkville which had filed suit against USF & G in Virginia.

Yorkville counterclaimed against the respondents, alleging the same theories of liability as had been stated by Three Garden and First Baltimore in their complaint.

USF & G moved for summary judgment against the petitioners on the ground, *inter alia,* that Stitt was not at the time of the misappropriations an "employee" of First Baltimore within the policy definition. The circuit court denied that motion. There is no record of the argument on this motion. It was denied by a written order which does not state the reasons for the ruling.

Thereupon Three Garden, First Baltimore and Yorkville moved for summary judgment. Their grounds were that "the material facts are, as USF & G asserted in its motion for summary judgment, undisputed, and the Court's denial

of USF & G's motion for summary judgment resolves the legal issues in favor of" the movants. At oral argument on petitioners' motion before the same judge who had denied USF & G's motion, counsel for Three Garden stated that, at the prior hearing, the court had suggested that petitioners move for summary judgment. The court then commented in part: "I remember the issue. The whole issue was the definition of employee." Further, when counsel for USF & G was arguing that there were numerous factual issues relating to the estoppel theory, the following colloquy took place.

"THE COURT: The main thing is the definition of employee of the contract.

"[COUNSEL FOR USF & G]: That is one issue.

"THE COURT: What other issues make a difference?"

At the conclusion of the hearing the trial court announced that the "correct decision" was to grant summary judgment in favor of the petitioners and against USF & G and, in order to be consistent, to grant summary judgment in favor of RCM & D on a motion which it had filed. No other or further explanation of the trial court's reasoning appears in the record.[4]

In a written order, filed in the case file and noted and summarized on the docket, the circuit court implemented the ruling which it had made from the bench. Judgment was entered against USF & G in favor of Three Garden and Yorkville for the amount of loss which they had respectively demonstrated and in favor of First Baltimore against USF & G for the amount of loss sustained by Ready and

---

4. In a "Joint Motion for Order to Correct Record," reviewed and approved by the trial judge, the parties stipulated that the transcript of the argument on petitioners' motion for summary judgment contained "numerous discrepancies." They further stipulated "that all of the issues raised in all the court papers relating to the motions for summary judgment and cross-motions for summary judgment were incorporated by reference at oral argument." This stipulation bears on preservation for appellate review but that is not an issue here. The stipulation does not inform us concerning the grounds for decision by the circuit court beyond the comments which we have quoted above.

Union. Judgment was entered in favor of RCM & D. The order did not expressly address petitioners' estoppel claims, which seemingly were considered to be moot as a result of the money judgments entered. There was no disposition of the third party claim against Stitt. The trial court, however, certified its judgments for immediate appeal pursuant to Maryland Rule 2–602. Those judgments had terminated the action as to all original plaintiffs and as to RCM & D.

USF & G appealed from the judgments entered against it. The petitioners, as a protective measure in the event judgment against USF & G were reversed, appealed from the entry of judgment in favor of RCM & D.

The Court of Special Appeals reversed the judgments in favor of the petitioners holding, "as a matter of law, that Stitt was not an 'employee' as that term was used in the fidelity bond." *United States Fidelity & Guar. Co. v. Three Garden Village,* 77 Md.App. 640, 653, 551 A.2d 881, 887 (1989). The intermediate appellate court concluded that the trial court had erred "when it denied USF & G's motion for summary judgment." *Id.* (footnote omitted). Because the merits of the petitioners' claim against RCM & D had never been evaluated, the Court of Special Appeals also reversed judgment in favor of RCM & D, without intimating any opinion on the merits. *Id.* at 653–54, 551 A.2d at 887.

We granted the petitioners' request for a writ of certiorari.

I

■ The principal issue before us is the grant, and subsequent reversal, of summary judgment for the petitioners against USF & G. The trial court seems to have concluded that the policy applied to the losses because Stitt was an employee of First Baltimore. At least the court did not intimate any other reason for its grant of summary judgment. It is important that we identify the basis relied upon by a trial court in granting summary judgment because, in the event that basis is erroneous, "the appellate court will

not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment." *Geisz v. Greater Baltimore Medical Center*, 313 Md. 301, 314 n. 5, 545 A.2d 658, 664 n. 5 (1988). *See Henley v. Prince George's County*, 305 Md. 320, 333, 503 A.2d 1333, 1339–40 (1986); *Metropolitan Mortgage Fund, Inc. v. Basiliko*, 288 Md. 25, 27–29, 415 A.2d 582, 583–84 (1980). For that reason we address only the "employee" issue and do not review petitioners' alternate argument that they are entitled to summary judgment on estoppel grounds.

The foregoing proposition also means that we do not review the denial of summary judgment for USF & G and do not evaluate all of the reasons advanced by USF & G for granting it summary judgment. Simply because summary judgment for petitioners was properly reversed, it does not follow that we can say that USF & G's motion was improperly denied. Even if the record before the circuit court at the time of USF & G's motion would have supported summary judgment for USF & G, the trial court's discretion to deny or defer ruling ordinarily prevents an appellate court from directing that summary judgment be granted. Without abusing its discretion, a trial court may decide, for example, that a party should be allowed a further opportunity to develop facts or to explore an alternate theory of claim or defense. *See Metropolitan Mortgage Fund, supra.*

### A

■ The Court of Special Appeals was correct in reversing summary judgment in favor of the petitioners on the present record. Under the policy USF & G agrees "to pay the Insured [i.e., First Baltimore] for ... Loss of Money which the Insured shall sustain ... resulting directly from one or more fraudulent or dishonest acts committed by an Employee[.]" "Employee" is a defined term. Under that special definition, as interpreted and applied in judicial

decisions, and under the facts of this case, as developed to date, petitioners have not shown as a matter of law on undisputed material facts that Stitt was an "employee" at the time of the losses. Although Stitt was "in the regular service of the Insured in the ordinary course of the Insured's business" and was compensated by the Insured, as the record now stands no other individual had "the right to govern and direct [Stitt] in the performance of such service[.]"

Whether an individual is an "employee" within the above-quoted language as found in standard commercial fidelity bonds depends on the facts of a given case. *See generally* W. Haug, *The Commercial Blanket Bond Annotated,* 1985 A.B.A. Tort and Ins.Prac.Sec.Pol.Annot. 32–40 (1985); Elliott, *Who is an Employee Under Fidelity Coverage,* 14 *Forum* 620 (1979). Where, as here, the dishonesty which causes the loss is that of a person who is the only officer, director and shareholder of the insured corporation, the cases are nearly uniform in holding that the standard commercial blanket bond does not cover. Cases of the instant type present the least complicated scenario for treating the embezzling employee as the alter ego of the insured corporation.

One commentator expressed the concept as follows:
"A corporate insured cannot recover on a fidelity bond for loss sustained due to its own fraud or wrongdoing. A corporation can, however, only act through its agents and, thus, to establish that a loss sustained by a corporation was sustained due to its own fraud or wrongdoing, it must be shown that the acts of the agent were in fact the acts of the corporation. In this context, a direct alter ego defense would be best illustrated by a factual situation demonstrating that the corporate agent perpetrating the fraud was the insured's sole shareholder, chairman and controlling member of the board of directors, as well as the president and chief executive officer, in sole and complete control of the corporation. In such a situation, the defrauding corporate agent would be the 'alter ego'

of the corporation in the sense he so owned and controlled the insured that his acts are in law the acts of the corporation so as to preclude coverage for the losses sustained."

Montgomery, *The Alter Ego Type Defenses Reconsidered,* 13 *Forum* 528 (1978).

*Employer's Admin. Servs., Inc. v. Hartford Accident & Indem. Co.,* 147 Ariz. 202, 709 P.2d 559 (Ariz.Ct.App.1985), is highly analogous to the instant matter. The named insured, Employer's Administrative Services (EAS), was wholly owned by two persons, Simmons and Lindstrom, who were also the sole officers and directors of EAS. That corporation administered group health plans for businesses which employed it to receive and disburse premiums, adjust and pay claims, and handle various administrative matters. Simmons and Lindstrom misappropriated $162,000 from employer accounts. The receiver for EAS sued on the fidelity bond issued to EAS which insured against loss of money through any dishonest act by any employee whom EAS had the right to govern and direct in the performance of service for EAS. Summary judgment for the insurer was affirmed. The court held in part:

"Simmons and Lindstrom were acting in concert and since together they constituted the totality of EAS's officers, directors and shareholders, they were never subject to anyone's governance and direction. EAS did not govern and direct them. To allow recovery on EAS's claim would in essence be interpreting the policy as allowing Simmons and Lindstrom to insure themselves through EAS, a corporation over which they had unbridled control, for their own intentional wrongdoing. This we will not do."

*Id.* at 206, 709 P.2d at 563.

Also on point is *Kerr v. Aetna Casualty & Surety Co.,* 350 F.2d 146 (4th Cir.1965), on which the Court of Special Appeals heavily relied. One of the named insureds under a fidelity bond was Cudd & Coan Underwriters, Inc. (Underwriters). Cudd and Coan were its principal officers, its only

directors and the direct owners of seventy-five percent of its stock, the remainder of which was held by a private corporation which they owned. Cudd and Coan had caused Underwriters to write off certain loans which it had made to them for personal purposes. In a suit by Underwriters's receiver the district court found against the surety after a bench trial. The United States Court of Appeals for the Fourth Circuit reversed. After quoting the bond's definition of "employees," who were limited to persons " 'whom the Insured has the right to govern and direct at all times in the performance of such service,' " the Fourth Circuit said:

> "Such a bond is not intended to cover the fraud and dishonesty of men who are in effect the sole stockholders, as well as the only directors of a closely held corporation. As noted above, the bond is intended to protect the corporation from the fraud or dishonesty of its employees, not to protect its creditors from the fraud or dishonesty of its stockholders and directors."

*Id.* at 154–55.

To the same effect *see McKee v. Great American Ins. Co.*, 316 F.2d 473 (5th Cir.) (defalcations by principal officer and sole stockholder of insured corporation), *cert. denied,* 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963).

The underwriting reason for excluding the corporate alter ego from coverage was expressed in *Farmers' & Merchants' State Bank v. United States Fidelity & Guar. Co.*, 28 S.D. 315, 133 N.W. 247 (1911). The fidelity bond in that case was issued to a bank, as obligee, covering a particular named employee as principal. The policy did not expressly require that the bank have the right to govern and direct the employee in the performance of service.[5] During the policy period the named employee purchased a majority of the bank's stock and thereafter embezzled. Judgment for the obligee was reversed. "While in one sense [the princi-

---

**5.** The banker's blanket bond was introduced in 1915. Commercial blanket bonds did not become available until 1926. *See* W. Haug, *The Commercial Blanket Bond Annotated,* at 4.

pal] continued to be an employe[e] of the corporation, he no longer was subject to the restraining influence of efficient supervision." 28 S.D. at 321, 133 N.W. at 249. Absent convincing evidence to the contrary, the court was of the view that "it would be unreasonable to assume that the defendant would insure the conduct of any [person] thus situated. An undertaking insuring a person against his own dishonesty would be, to say the least, a novel and unusual contract." *Id.* The court concluded that "[w]hen the person whose conduct is insured ceases to be an employe[e], within any fair and reasonable interpretation of the term as used in the policy, the insurer's liability should cease, unless he has notice of the change." *Id.*

Cases in which the dishonest employee is the sole owner, officer and director of the insured corporation are at one pole of a continuum of factual variations. Under the cases clustered at that pole, and reviewed above, there is no coverage. As the facts change and move away from that pole, the cases do not uniformly apply the alter ego analysis. Nevertheless, cases which refuse to apply an alter ego defense recognize that there would be no coverage if the dishonest employee were, in fact, the sole stockholder, officer and director of the insured corporation.

For example, *Charm Promotions, Ltd. v. Travelers Indem. Co.,* 447 F.2d 607 (7th Cir.1971), involved a named insured which was equally owned by two corporations which were respectively owned by two different groups of persons in different cities. Each stockholder could elect one-half of the board of directors of the insured corporation. The dishonest acts were committed by persons active in the business who were members of only one of the two groups. The appellate court reversed a summary judgment for the surety. The court would not assume a perpetual deadlock or that no director from either group would ever join the other when the serious interests of the insured corporation were involved. Distinguishing *Kerr v. Aetna Casualty & Surety Co., supra,* the *Charm Promotions* court pointed out that the case before it "does not involve a situation where

the officer involved is the sole or majority shareholder of the insured[.]" 447 F.2d at 612.

In *General Fin. Corp. v. Fidelity & Casualty Co.*, 439 F.2d 981 (8th Cir.1971), the fidelity bond applied to the loss caused by the insured corporations' president who, with his wife, owned a majority of the stock, because there were boards of directors on which the president had only one vote. Thus, the directors "at all times had the right to govern and direct the exercise of all corporate powers," even if the boards had in fact operated as "rubber stamps." *Id.* at 984. *See also Insurance Co. of North America v. Greenberg*, 405 F.2d 330 (10th Cir.1969).

Thus, while Stitt was an employee of First Baltimore within the ordinary meaning of that term, petitioners have not shown on undisputed, material facts that he was an employee as a matter of law within the policy definition of that term at the time of the losses. When issued, the policy applied to loss caused by defalcations perpetrated by Stitt, but only so long as DeSalvo maintained a role in the company which made its affairs subject to his control to some degree and so long as DeSalvo was not involved in the embezzlement. In essence, changes in the relevant facts within First Baltimore after the policy was issued and before the loss was incurred affected Stitt's status as an "employee."

Petitioners rely on two cases to oppose application of the alter ego rationale. They cite *Seattle Int'l Corp. v. Commerce & Indus. Ins. Co.*, 24 Wash.App. 108, 600 P.2d 612 (1979), for the proposition that "a corporation's separate legal identity is not lost because one person owns all the stock." Brief of Petitioners at 10. We have no quarrel with that general proposition, which is attested to by our cases refusing to pierce the corporate veil. *See, e.g., Starfish Condominium Ass'n v. Yorkridge Serv. Corp.*, 295 Md. 693, 458 A.2d 805 (1983). The facts of *Seattle Int'l*, however, are of no help to petitioners. There the insured corporation operated a franchised pancake restaurant. A manager of the business agreed to purchase all of the

corporation's stock from the married couple who owned it. The purchase price was to be paid in monthly installments while the shares were held in escrow. The two sellers and their third corporate director were joined on the board by the purchaser and his wife. The purchaser embezzled and absconded. Because the purchaser had the right to vote the stock during the period of the escrow, the surety argued that the fidelity bond did not cover. The trial court had found that the corporation held regular meetings of its board of directors. In the context of holding that the purchaser's right to vote the stock did not "establish the purchaser as the corporation" the court made the statement, relied upon by petitioners, that the corporation's separate legal identity was not lost because all of its stock was held by one person. 24 Wash.App. at 111, 600 P.2d at 614.

Petitioners also rely on *American Empire Ins. Co. v. Fidelity & Deposit Co.*, 408 F.2d 72 (5th Cir.), *cert. denied*, 396 U.S. 818, 90 S.Ct. 55, 24 L.Ed.2d 69 (1969). The insured corporation in that case managed a pool for various insurance companies which insured crops against damage by hail. The chief executive officer of the insured, Clarke, who was its controlling shareholder, purloined premiums payable to pool participants. Petitioners say *American Empire* held that the fact "that the dishonest person is the alter ego of the insured corporation—does not eliminate the fidelity insurer's liability." Brief of Petitioners at 10–11. The sole issue, however, was "whether or not the [claimant pool participants] are third party beneficiaries of the bond[.]" 408 F.2d at 74. The court held that they were not and affirmed the trial court's entry of summary judgment against the pool participants. The remaining parties proceeded to trial. The opinion of the trial court, *Fidelity & Deposit Co. v. USAFORM Hail Pool, Inc.*, 318 F.Supp. 1301 (1970), *aff'd in part and vacated in part*, 463 F.2d 4 (5th Cir.1972), directly addresses the alter ego defense. That opinion reveals that the insurer never contested

whether the bond covered Clarke, who was admittedly the alter ego of the corporation.[6]

## B

■ Three Garden's complaint and Yorkville's counterclaim include third party beneficiary claims against USF & G for breach of the promises in the bond. The weight of authority is against that analysis of the policy language, absent additional facts demonstrating an intent to benefit the third party.

Fidelity bonds are a form of first party coverage, indemnifying the obligee for its loss, and are not a form of third party coverage, indemnifying the insured for its liability to third persons. Consequently, it has been held that a third party which has suffered a loss as a result of the dishonesty of an employee of the insured may not predicate a claim against the fidelity insurer solely on the fact that the dishonesty rendered the insured legally liable to the third party. For example, in *Everhart v. Drake Management, Inc.*, 627 F.2d 686 (5th Cir.1980), the insured, a mortgage loan broker, had represented a bank in the placement of an interim loan. When a permanent loan was later obtained, the settlement attorney transmitted the funds to pay off the interim lender (Bank) to the broker which misappropriated them. The Bank sued on the bond, but the court affirmed

---

6. The decision illustrates the factual differences between that case and the one before us. First, the parties stipulated the chief executive officer was the alter ego of the named insured. "It was also stipulated that as a matter of fact and law, Clarke was a covered employee under the bond and that the bond was in full force and effect at all times material to [the] suit." 318 F.Supp. at 1305. Second, at trial an agent of the insurer stated that at the time the insurer wrote the bond, it "knew everything about Clarke's operation, including his stock ownership and the fact that he would be managing large sums of money belonging to others; that Clarke controlled the named insured corporations and that he was the only one in position to misappropriate a substantial sum of money." *Id.* at 1309. Further, it was admitted that the chief executive officer was a covered employee despite the fact that he was the sole stockholder and alter ego of the named insured.

summary judgment in favor of the insurer, reasoning as follows:

> "A legal liability of Insurer to Bank cannot be predicated on one owed by [the broker] to Bank. The policy meant what it explicitly stated—only [the broker] was insured against losses by its employees. If Bank desired coverage, it had the contract right to request a specific and individual bond be purchased running directly for its benefit as provided in the servicing agreement."

*Id.* at 691 (footnote omitted). *See also American Empire Ins. Co. v. Fidelity & Deposit Co., supra; Western Nat'l Bank v. Hawkeye–Sec. Ins. Co.,* 380 F.Supp. 508 (D.Wyo. 1974); *Employer's Admin. Servs., Inc. v. Hartford Accident & Indem. Co., supra; Ronnau v. Caravan Int'l Corp.,* 205 Kan. 154, 468 P.2d 118 (1970); *Foxley Cattle Co. v. Bank of Mead,* 196 Neb. 587, 244 N.W.2d 205 (1976); *Commercial Bank v. St. Paul Fire & Marine Ins. Co.,* 336 S.E.2d 552 (W.Va.1985). Similarly, direct action statutes applicable to liability policies do not authorize actions by third parties against sureties on fidelity bonds even where the dishonesty of the obligee's employee has caused the insured employer to become liable to the third party claimant. *See Anderson v. Employers Ins. of Wausau,* 826 F.2d 777 (8th Cir.1987); *175 E. 74th Corp. v. Hartford Accident & Indem. Co.,* 435 N.Y.S.2d 584, 51 N.Y.2d 585, 416 N.E.2d 584 (1980).

Three Garden and Yorkville point to the evidence in this case indicating the intent, shared at least by First Baltimore and RCM & D, that the bond benefit the customers of First Baltimore. We shall assume, *arguendo,* that this evidence is uncontradicted and compels the legal conclusion that all customers of First Baltimore are third party beneficiaries of the bond contract between First Baltimore and USF & G. Nevertheless, "a third party beneficiary takes subject to the same defenses against the enforcement of the contract, as such, as exist between the original promisor and promisee." *Shillman v. Hobstetter,* 249 Md. 678, 690, 241 A.2d 570, 577 (1968). Even if Three Garden and Yorkville are third party

beneficiaries, the promise which they seek to enforce operates only if the loss results from the dishonesty of an "employee" of First Baltimore, as defined. For the reasons stated in Part I A, *supra*, Stitt's role as alter ego of First Baltimore, at the time of the loss, prevents summary judgment for the claimants as third party beneficiaries of the bond, as written.[7]

## C

Petitioners also contend that it is "undisputed" that "the bond was intended to fulfill the requirements imposed upon First Baltimore by HUD regulations, including that coverage extend to Stitt[.]" Brief of Petitioners at 14. There is precedent for permitting a third party to sue the insurer directly on a fidelity bond issued in order to comply with a statutory requirement. *See Anchor Equities, Ltd. v. Pacific Coast American*, 105 N.M. 751, 737 P.2d 532 (1987) (statute regulating escrow companies). In the matter before us it would have greatly assisted the Court if petitioners had cited the statute or HUD regulation on which they predicate their argument. Our independent research does not disclose any statute or regulation pertinent to the facts as presently developed. Consequently, we cannot consider that the petitioner's claim is based on a statutorily required bond.

The record does contain the written housing management agreement relating to Three Garden. Paragraph sixteen, dealing with "Fidelity Bond," provides:

"The Agent will furnish, at its own expense, a fidelity bond in the principal sum of Five Hundred Thousand Dollars ($500,000.00), which is at least equal to the gross

---

7. Three Garden is an assignee of First Baltimore's claim on the bond for the loss it suffered. The assignment was signed for the named insured by Stitt. Three Garden and Yorkville also hold judgments against First Baltimore. Claims as assignees and attachments laid on USF & G as garnishee, attempting to reach debts due to First Baltimore under the bond, would be subject to the same lack of coverage defense.

potential income of two months and is conditioned to protect the Owner and the Consenting Parties against misapplication of Project funds by the agent and its employees. The other terms and conditions of the bond, and the surety thereon, will be subject to the approval of the Owner and the Consenting Parties."

In that agreement the "Consenting Parties" are the Secretary of HUD and the holder of the mortgage on the property. The housing management agreement between Yorkville and First Baltimore contains a similar fidelity bond provision.

In view of the fact that we are remanding to the circuit court, there will be an opportunity more fully to develop any HUD bond dimension to this case.

## II

The mandate by the Court of Special Appeals reversed the judgments of the Circuit Court for Baltimore City in favor of the petitioners. We agree with that portion of the mandate. The Court of Special Appeals also reversed judgment in favor of RCM & D and, without intimating any views on the liability of that party, remanded for further proceedings. With that portion of the mandate of the intermediate appellate court, we agree.[8] The observation

---

8. The USF & G brief essentially argues only that the commercial, blanket, fidelity bond issued in this case does not cover Stitt's misappropriation of the funds of customers of First Baltimore. That brief does not say how a property owner in the position of Three Garden insures against defalcation by the sole principal of its incorporated property manager. Some of the reported decisions illustrate fidelity coverage effected without attempting to shoehorn it into the preprinted boilerplate employed in the instant matter.

In *Standard Title Ins. Co. v. United Pac. Ins. Co.*, 364 F.2d 287 (8th Cir.1966), a title insurance company obtained a commercial, blanket bond covering its policy issuing agents. By a rider to the standard fidelity policy it was agreed that wherever the word "employee" was used in the bond it would be changed to "agent." The boilerplate definition of "employee" was deleted and, by rider, a special definition of agent was inserted. In essence, that definition applied to any person, partnership or corporation which had entered into an agency

by the Court of Special Appeals that the circuit court erred in denying summary judgment for USF & G appears only in that court's opinion, but is not directly implemented by that court's mandate. Accordingly, our mandate, when issued, will provide as follows:

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN ALL RESPECTS EXCEPT THAT, UNDER THE REMAND, THE FURTHER PROCEEDINGS SHALL NOT BE INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE PETITIONERS.

---

agreement with the named insured and the term excluded any officer, clerk or other employee of the insured.

In *Insurance Co. of North America v. Greenberg*, 405 F.2d 330 (10th Cir.1969), the purchasers of the accounts receivable of the named insured obtained an endorsement to the blanket fidelity bond issued to the assignor of the accounts by which the purchasers of the accounts were covered for " 'any direct loss which [they] shall sustain of money, securities or other property ... through the fraudulent or dishonest misapplication, misappropriation or conversion committed by any one or more of the Employees as defined in the attached bond[.]' " *Id.* at 331–32. Although the incorporated definition of "employee" included the "right to govern and direct" limitation, the misappropriating officers were "neither the sole directors nor the sole or majority shareholders of" the assignor of the accounts. *Id.* at 333. *See* Part II A, *supra.*

*American Nat'l Ins. Co. v. United States Fidelity & Guar. Co.*, 215 So.2d 245 (Miss.1968), involved a mortgage lender which used independent contractor loan servicing agents to collect installment payments. That lender obtained a fidelity bond from Insurance Company of North America covering "any loss of money or other property which the insured should sustain through acts committed by its agent, defined as 'any loan agent, or loan correspondent' while representing the insured." *Id.* at 249. When an agent misappropriated the lender's funds, INA paid the loss and then subrogated against the agent.